**TRANSPORT INSURANCE COMPANY, Lindsey & Newsom Claims Services and Janet E. Jones, Appellants,**

**v.**

**Paula Trippel FAIRCLOTH, Appellee.**

**No. 09–92–118 CV.**

Court of Appeals of Texas, Beaumont.

May 27, 1993.

As Corrected Sept. 17, 1993.

Arthur K. Smith, Calhoun & Stacy, Dallas, for appellant.

George E. Chandler, Lufkin, John E. Kinney, Woodville, David Porter, Porter & Duran, Lufkin, William W. Kilgarlin, Powell, Popp & Ikard, Austin, L. Brent Farney, Law Offices of George Chandler, Lufkin, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

Paula Trippel Faircloth, as plaintiff, filed a suit in the District Court of Tyler County. The appellants here were named defendants. In a jury trial, Paula Faircloth received a favorable jury verdict. The jury's answers were supportive of a judgment based on different causes of actions under different theories of recovery. After verdict, Paula basically moved for relief and judgment under TEX.INS.CODE ANN. art. 21.21 (Vernon 1981 and Vernon Supp.1993).

Paula's theory of her case was that on May 15, 1984, Judith and Marvin Kervin were wrongfully killed when struck by a Transport insured Allied truck. The allegations were that the truck came across the center stripe of U.S. Highway 69 at a point north of Woodville, colliding with an oncoming motor vehicle in which the Kervins were riding. A fundamental thrust of the present litigation was that Transport and its agents and representatives engaged in a course of conduct which resulted in (allegedly) grossly underpaying Paula the true value of her claims and losses. Paula's petition also recited that the several defendants engaged in certain acts and courses of conduct that defrauded Paula.

Concerning parentage, Paula has never claimed that Marvin Kervin was her natural father. Her position was that Marvin was just like a Daddy to her and the only Daddy she had ever known. A birth certificate exists. This birth certificate reflects that Judith Kervin is Paula's mother.

Immediately subsequent to the May 1984 collision, Transport engaged Lindsey & Newsom Claim Services as adjusters and investigators to investigate and look into the collision and to manage any potential liability damage claims. Lindsey & Newsom speedily dispatched one of its adjusters and investigators to make the investigation for Transport. This person was one Janet E. Jones. Ms. Jones, after looking into the relevant matters and surrounding circumstances, concluded that Paula was the daughter of Judith Kervin. Paula at the time, after May 15, 1984, was orphaned—a double orphan at her age of 15. Ms. Jones then commenced the process of settling and adjusting Paula's claims for damages against Transport. Paula has alleged that Ms. Jones' actions and conduct were authorized by Transport.

Paula filed several amended original petitions. In her live pleadings she complained of Transport Insurance Company, Troy Caldwell, individually and in his fiduciary capacity as the guardian of Paula, Lindsey & Newsom Claim Services, Janet E. Jones, and other defendants.

After pleading numerous definitions and statutes, Paula alleged that she was a consumer under TEX.BUS. & COMM.CODE ANN. § 17.41 et seq. (Vernon 1987), known as the Texas Deceptive Trade Practices–Consumer Protection Act. She further alleged that Transport and some of the other defendants violated her rights under TEX.INS.CODE ANN. art. 21.21–2 (Vernon Supp.1993).

The allegations concerning factual matters were lengthy and in detail. Paula's allegations include a description of a scene at the funeral home, where Paula was making the arrangements for the funeral services of her loved ones. This scene took place within 24 hours of the fatal collision. Paula alleged

that she was approached by Ms. Jones who allegedly identified herself as an insurance adjuster who was working for Lindsey & Newsom, who in turn were looking after the affairs of Transport. Paula asserted that Ms. Jones commenced talking to Paula about the fact that all claims for damages for the deaths needed to be immediately settled. Paula then alleged that Ms. Jones stated that if these claims were not settled very early that probably Paula would not recover any damages. These allegations are set out in Paula's trial pleadings.

Paula claimed that she was in an extreme emotional state at the time and was totally unfamiliar with legal matters. The next day or so the defendant, Caldwell, a friend, introduced Paula to an attorney at law residing in east Texas. The funeral services for Marvin and Judith were conducted on May 20, 1984. On May 22nd the attorney for the friend and defendant Caldwell caused to be filed an application for the appointment of Troy Caldwell to act as temporary guardian of the person and estate of Paula Marie Trippel, now Mrs. Faircloth. Paula alleged that she was improperly induced to execute a selection of a guardian. She, under the circumstances, selected Caldwell. On the same day, May 22nd, a county court entered an order appointing Caldwell as the temporary guardian of the estate and person of Paula.

On the same date the county court approved and authorized a fee arrangement between Caldwell as guardian, and an attorney, Askins. The attorney was to receive one-third of the settlement proceeds. Caldwell filed an initial bond of $1,000 as temporary guardian. Paula alleged that each of the defendants named was aware of the application of Caldwell to be appointed temporary guardian. No record in the nature of a statement of facts was made of the proceedings with respect to this application for the appointment of a temporary guardian.

In mid-June 1984 the temporary guardian filed his application to be made the permanent guardian. On June 19, 1984, an order was entered appointing Caldwell as the permanent guardian. On that same date a settlement was entered into by and between Transport and the guardian, settling the claims of Paula. The settlement amount was $250,000. The county court entered an order approving such a settlement on the same date, June 19, 1984. The guardian's bond was increased to $20,000. No record in the nature of a statement of facts was made of the proceeding involving the appointment of a permanent guardian or the setting of the bond. No guardian ad litem was appointed. No attorney ad litem was appointed. The settlement proceeding was not recorded.

Paula further alleged that on the same date, June 19, Caldwell in his capacity as permanent guardian executed a full and complete release of all her claims.

Paula averred that she was of such a tender age that she could not bind herself to any of the terms or conditions of the said release of the various defendants. She maintained that the attempted settlement was grossly inadequate and that she was not in any mental state emotionally, intellectually or otherwise to be engaged in such settlement matters so soon after the death of her loved ones; and that several of the defendants, namely, Transport, Caldwell, Jones, and others collectively took unfair advantage. She asserted she was entitled to a district court hearing with a guardian ad litem or an attorney ad litem to independently and adequately represent her welfare and her long range interest. Paula claimed she needed protection from her guardian.

Paula averred that the defendants acted in concert and that the defendants had a duty to deal with her fairly under the facts and that they violated this duty. Paula pleaded for relief under numerous statutes and theories of recovery, including the DTPA. She especially alleged that Transport, Caldwell, Lindsey & Newsom, and Jones represented to her (immediately after the funeral) that if she took her claim for the death of her parents to court she would, in all probability, receive nothing—and in any event, would receive far less than the settlement offer of $250,000. Paula states that $250,000 was grossly inadequate and that these defendants engaged in other misleading and other deceptive acts and practices, specifically violating DTPA, § 17.46, in various aspects and that the defendants engaged in unconsciona-

ble action and courses of action entitling Paula to recover damages under DTPA § 17.50 and further, that Paula was entitled to recover under the provisions of art. 21.21 of the Texas Insurance Code.

Other causes of action were pleaded by Paula including, inter alia, actions based on fraud, duress, bad faith conduct, wrongful conspiracy. In separate paragraphs, Paula alleged that the defendants had breached the duty to deal in good faith and to deal fairly and that the defendants breached fiduciary duties and that each of the defendants acted with fraud, oppression, and malice, and that the plaintiff was therefore entitled to recover punitive damages. Paula petitioned for attorney's fees and various other relief.

Paula alleged that her guardian, Caldwell, had not taken his oath and the bond of the guardian was not filed in the office of the County Clerk until these filings were made on July 13, 1984, being after the attacked settlement was consummated. Caldwell has been described as a part-time minister. Caldwell and his daughter had known Paula to some degree. Paula began living in Caldwell's house. Paula pleaded that the defendants and their employees, agents, attorneys, and other representatives knowingly dealt with Paula as a claimant and knowingly undertook negotiations with her and knowingly lead her into an unfair and grossly inadequate settlement. Paula averred that these defendants and others had a duty to deal with her, a fifteen-year old, fairly under the *facts and circumstances. And she main-*tained that this duty existed at common law and under the defendants' own policies, procedures and standards, as well as the Unfair Claim Settlement Practices Act, TEX.INS. CODE ANN. art. 21.21–2, and by other statutory enactments. The plaintiff set out that the defendants had full knowledge of the deceptions being perpetrated on her, even while the defendants were in the role of a fiduciary towards the minor. These fiduciary duties were violated. Paula took the position that Caldwell had a special fiduciary duty towards her since he was the guardian of her person and estate.

The charge of the court to the jury contained thirteen questions but many of the questions had numerous subparts or subquestions. The jury's answers to these questions were favorable to Paula and were adverse to several of the defendants.

The jury found that two of the defendants failed to act in good faith regarding the value of Paula's claim; the jury found that two of the defendants breached their fiduciary duty to Paula. The jury found that three of the defendants were guilty of fraud in connection with the settlement. Answering question number four, the jury found that five defendants engaged in a civil conspiracy to defraud Paula of the true value of her claims.

The jury found in favor of Paula in that four of the defendants had engaged in false, misleading or deceptive acts or practices that were a producing cause of damages to Paula.

Appellant Transport Insurance Company presents several points of error. The first point of error maintains that the trial court erred in submitting jury questions three, five, seven, eight, nine, ten, and thirteen to the jury because there was no evidence that any conduct complained of in those questions existed. Also, none of the conduct complained of caused Paula any damage. *Clearly, this is a no evidence point or no legal evidence point.* Paula had claimed that Transport was involved in the settlement negotiations as the insurer for Allied Van Lines. Allied Van Lines owned and operated the truck which was involved in the vehicular collision that resulted in the deaths of the Kervins. Paula's position was that Lindsey & Newsom and Jones (being fully authorized and instructed) were deeply and intimately involved in the settlement as agents representing Allied and Transport. These agents were acting within the scope of their authorized agency.

Paula's brief concedes and asserts that her present suit was filed and prosecuted because of the conduct of Transport and its agents and representatives which resulted in grossly defrauding and underpaying Paula the true value of her claims.

Paula's position is that during the course of negotiating to bring about the settlement, Transport and its agents, employees and representatives achieved the grossly inadequate

result by: (1) making certain false representations to Paula; (2) by conspiring unlawfully with the attorney chosen for Paula; (3) omitting to file and obtain a full hearing in a friendly suit in the district court (which would have insured the appointment of an independent guardian ad litem to protect Paula's interest); (4) taking devastating advantage against Paula because of Paula's youth and immaturity; and (5) using the fact that she had a trusting nature in certain adults.

Paula fervently argues that Transport, through its agents, employees and representatives, located certain unscrupulous protagonists who (during the course of the settlement negotiations) took advantage of Paula for their own financial gain. Reverend Caldwell, a minister of the gospel, who has no relationship to Paula, took possession of Paula after the death of the Kervins. The guardian charged high prices for Paula's room and board. Paula argues that Caldwell's attorney wrongfully seized one-third of the initial settlement without doing any real investigative work or without engaging in good faith, vigorous *vis-à-vis* negotiations.

After the passage of time, Paula reached her majority and she brought the instant case. Bearing in mind that the appellants' premier point of error is that the trial court erred in submitting seven basic jury questions because there was "no evidence" that any conduct complained of caused Paula any damages whatsoever, we must review this very broad, multifarious point of error on a "no evidence" basis.

The appellants' brief concedes that this premier point is a "no evidence" point or to use the appellants' terminology a "legal insufficiency" point. Appellants dogmatically argue that there was no evidence introduced at trial to support an essential element of a theory of recovery. A quote from the brief is:

> The objective of this brief is to obtain rendition of a judgment in Appellants' favor by outlining the lack of evidence presented at trial regarding Trippel's various theories of recovery. Without the requisite evidentiary underpinnings, Trippel's claims should not have been presented to

the jury, and no damages should have been awarded based thereon. Appellants' "no evidence" points must be sustained for any one of the following reasons:

> 1) there is a complete absence of evidence in the record of a vital fact;

> 2) this court is barred by rules of law or evidence from giving weight to the only evidence offered in the record to prove a vital fact;

> 3) there is no more than a scintilla of evidence in the record to support a vital fact; or

> 4) the evidence establishes conclusively the opposite of a vital fact.

The appellants place major reliance on two decisions. They are: *Yarbrough v. Booher*, 141 Tex. 420, 174 S.W.2d 47 (1943); *Otis Elevator Co. v. Joseph*, 749 S.W.2d 920 (Tex. App.—Houston [1st Dist.] 1988, no writ).

An intermediate court, in reviewing and passing upon a "no evidence" point (a "legal insufficiency" point) must consider only that evidence and the reasonable inferences drawn therefrom in their most favorable light that tend to support and sustain the findings of the jury. The intermediate appellate court must disregard all contrary evidence and all contrary inferences from the unfavorable evidence. *King v. Bauer*, 688 S.W.2d 845 (Tex.1985); *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). A "no evidence" point is a question of law. The rule is firmly established that we must reject all evidence and all reasonable inferences to the contrary. *Glover, supra.*

If there exists in the record any evidence possessing probative force to support the findings of the jury, then the "no evidence" point must be overruled and the jury's answers must be upheld. *See, In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

Of course, it is Hornbook law that an intermediate court of appeals simply does not have the power to substitute its opinion or its conclusions on factual matters differently from that of the jury's determinations. This is true even though the intermediate appel-

late court might have reached a different fact conclusion. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792 (1951). The members of the jury act as the sole judges of the credibility of the witnesses and the weight to be given their testimony. In briefest summary, if there exists more than a scintilla to support the jury's answers to the relevant, controlling questions, we must affirm those findings.

■ When both parties rested and closed, the evidence in the record raised the issues of unconscionable fraud that had been visited upon a fifteen-year old girl. The record reflects that the appellants had set into motion various acts and courses of conduct that the jury said amounted to fraud. Interestingly, the jury also found the existence of a civil conspiracy on the part of all of the defendants, having the effect of depriving Paula of her just claim for damages and other rights.

In answer to jury question number four, the jury found that Transport, Lindsey & Newsom, Caldwell, Ms. Jones, and Askins had engaged in a civil conspiracy to defraud Paula of the true value of her claims. Jury question number four contained the following instructions:

> You are instructed that a "civil conspiracy to defraud" on the part of two or more persons means a common purpose, supported by a concerted action to defraud, that each has the intent to defraud and that it is common to each of them, and that each has the understanding that the other has that purpose. Actual understanding may be mere consent without protest or acceptance of the benefits of the transaction.
>
> You are further instructed that a civil conspiracy need not be shown by direct evidence but may be established by inferences or circumstantial evidence, in that ordinarily civil conspiracies are conceived in secrecy and executed in a manner to avoid detection and exposure.

Thus, under the theory of a civil conspiracy and under the instructions given to the jury, the factfinders could consider the inferences and the circumstantial evidence.

Among other phases and strains of evidence, there is in the record testimony about a meeting. At this meeting Ms. Jones, Askins, and Caldwell were present. The record reflects that they were going over the situation with Paula. They mentioned the figure of exactly $250,000. Again, it was repeated that this figure was "real good" and that she should go ahead and settle—the sooner, the better. In general, they were representing to Paula that it would not be to her interest to go to court. There were statements that Paula should settle fast.

The participants strongly advised that Paula go with the attorney already involved because that attorney was already familiar with the case and that he knew what was going on. Also, that attorney had acted as an adjuster for the Allied Van Lines. The conversation was to the effect that if this particular attorney were engaged, then there would be a better chance of getting a good settlement. The record reflects that Ms. Jones verified these statements. The record reflects:

Q  Do you feel that Paula got the impression that these folks were concerned and were trying to do what was in her best interests?

A  Yes, sir.

Q  Do you feel that they were trying to make her believe that?

A  Yes, sir, I do.

Q  Do you feel that they were successful? And by the term they, I'm referring to those people I've earlier identified, the insurance folks. Do you feel that they were successful in communicating to Paula a feeling that she was in good hands and she could trust them because they were concerned about her?

A  Yes, sir.

Q  Did these people, from what you heard them tell Paula, and also at the same time what they were telling you, did you believe that Michael Askins had some type of special relationship with Allied that would help you settle your case for a fair sum if you hired him?

A  Yes, sir.

Q  And did Janet Jones give blessing to that? In other words, was she giving acknowledgement to that?

A  Yes, sir.

Q  Did they make Paula feel the same way?

A  I believe so.

Q  Did anybody there ever suggest to Paula or to you that you should get a second opinion?

A  No, sir.

Q  Did you later become worried about what was happening?

A  Yes, sir, I did.

Q  Did you learn that about 17 or 18 days after this meeting, Paula's case was settled?

A  Yes, sir, I did.

Q  Did you learn that after the settlement, that a guardianship was created for Paula with Caldwell as the guardian?

A  Yes, sir.

Q  Did you learn that Paula became extremely worried about her money?

A  Yes, sir.

The above testimony was given by Maurice Dell Jackson, the step-brother of Paula. Dell was present at the meeting.

Q  Okay. When—let me look at my notes here. I tried to take down your testimony accurately, and the jury can hear it verbatim. You indicated that Janet Jones didn't say that Paula had to take the money but that she was recommending it. One of my jobs in this deposition is to find out just how much detail you remember. Do you recall anything more than that, that Janet Jones was recommending it?

A  She really highly recommended it. That's the reason I went with Mr. Askins because she recommended, you know, he knew the case, he worked with them before, and—on different stuff, you know.

Q  I'm hoping you're following me here. I do want to know if these people were conning Paula or not. What did they tell her? What do you—just strike everything I just said.

What do you remember sitting here right now about what they told Paula could happen if she went to trial?

A  They said she could come up with nothing.

Dell so testified.

Evidence exists that Rev. Caldwell had met Ms. Jones the day that the tragic, fatal accident took place or shortly thereafter. From Rev. Caldwell's testimony, the facts were revealed that Ms. Jones came to the Reverend's house on the night of May 18— the date of the deaths. Ms. Jones understood that Paula was temporarily at the Reverend's home. After some conversation took place, Ms. Jones departed. Paula didn't really want to talk to anyone. She stated early on something to the effect that "Pappaw [Reverend Caldwell], you know how to handle stuff like that; and I don't want to see these people."

Quickly Rev. Caldwell contacted an attorney at Woodville, desiring to have a temporary guardianship. The Woodville attorney advised that it would take about two or three weeks. The attorney involved was asked to proceed with a temporary guardianship in order that Paula would not have to go to live with some aunts and uncles. She desired not to do so. The Woodville attorney recommended the filing of a suit. The Reverend declined and looked for another attorney.

After the initial meeting between Ms. Jones, Paula, and Rev. Caldwell with others present, Ms. Jones left. She returned to Woodville at a later time. With her was a representative of Transport Insurance Company, a Mr. Mark Maneval. Mr. Maneval worked for Transport Insurance Company. The record reflects:

Q  Did you come back on Monday?

A  Yes, I did.

Q  On Monday, you brought a representative from Transport, correct?

A  That's correct.

Q  Now, you've seen Mr. Maneval's testimony on videotape. Did he say that he worked for Transport Insurance Company?

A  Yes, he did.

Q  Do you have any reason to disagree with him?

A  No, I don't.

. . . .

Q  Now, Mr. Maneval was engaged in the practice of insurance and adjusting claims just as you were when you made these visits?

A  Yes, sir.

Q  And at all times throughout this entire process, both you and he were engaged in the business of your companies and not acting alone?

A  Correct.

Q  And in doing so, both of you were engaged in the practice of insurance and adjusting claims?

A  That's correct.

This testimony of Janet Jones, along with other evidence, demonstrates that Jones and Maneval were engaged in the insurance business and engaged in the process of working on claims for an insurance company.

Mr. Mark Maneval testified that he acknowledged the concept of the covenant of good faith and fair dealing and it applied to his actions in the process of adjusting and settling claims. He acknowledged, in a very meaningful way, that he had a responsibility and a duty to deal fairly and equitably with persons who had claims or litigation to be adjusted. We find:

Q  Do you recognize the covenant of good faith and fair dealing as being applicable to you in your practice of the insurance business and adjusting claims with third parties—

MR. GLOVER: First, can I have a running objection of the same variety?

MR. CHANDLER: Yes.

MR. GLOVER: Thanks.

A  Yes.

BY MR. CHANDLER:

Q  And do you try to practice that covenant of good faith and fair dealing with people with whom you deal as claimants?

A  Yes.

Q  Do you believe that you're responsible to be certain that whatever settlement is involved with the people that your dealing is fair and equitable?

A  Yes.

Q  And did you practice that same covenant of good faith and fair dealing with people with whom you dealt as claimants back in March [sic] of 1984 just like you do here today?

A  Yes.

Thus, Mr. Mark Maneval was cognizant of the duty and obligation known as the covenant of good faith and fair dealing. It applied to third persons such as Paula. Of compelling and cogent importance touching upon all these matters is the body of evidence that shows that the insurance carrier had consulted with certain prominent Beaumont attorneys. These Beaumont attorneys made an evaluation of the case at up to a figure of $500,000 and possibly even higher. It was stated that the Houston defense counsel felt comfortable with a figure of $350,000 to $400,000. We note:

Q  (By Mr. Chandler) Let me read it out loud. "Beaumont counsel initially evaluated the case at up to $500,000, possibly higher." It doesn't say anything about punative [sic] damages. That's right. I just assumed it did. It says, "possibly higher," without mention of punative [sic] active damages, "while Houston counsel felt comfortable at $350,000 to 400,000." . . . .

In view of the half million dollar figure, certain additional testimony is probative. Ms. Jones played a significant part in assisting Caldwell to obtain the services of an attorney. Seemingly, Ms. Jones had actually called an attorney before Rev. Caldwell had qualified as guardian and the carrier company had paid for the filing fees necessary to commence the guardianship proceeding. From all the facts and surrounding circumstances the jury could properly conclude that Paula's claims and case were settled for only one-half of its true value, bearing in mind that this evaluation of $500,000 was placed and arrived at by eminent, qualified defense attorneys.

The attorney handling the guardianship did not make a written demand upon the insurance company. He did not interview

the driver of the truck responsible for the fatal collision. According to his testimony, the settlement monies were paid by an $83,333 check made out and payable to him personally from Transport and also a $166,666 check that was made out and payable to Rev. Caldwell in his capacity as guardian of Paula. The attorney for Rev. Caldwell gave the following testimony:

Q Let me ask you some more specific questions. Did you make a written demand on these Defendants or this insurance company of any sort?

A I don't think so.

Q Did you make a written notification to these Defendants or their insurance carrier of your representation of Paula and her guardian?

A I believe so, yes.

Q Did you interview any eyewitnesses to this accident?

A I believe Mr. Patillo was a driver. I'm not sure. I never got to interview him, no, sir. If I'm not mistaken, I was furnished a copy of his statement, for whatever it was worth. And I didn't have any questions about it, and wouldn't have had under the circumstances because it was clear that the truck had crossed over and crushed a little Luv truck, flat killing both Mr. and Mrs. Kervin, causing them injuries that let them die.

Q Can you tell me who furnished you a copy of the driver of this truck's statement?

A Yes. I believe it was Mike, whatever his last name is.

Q This person that—

A Roggen or Ruggen (pronouncing).

Q Were you furnished any other information by the insurance company to help you evaluate this claim, Mr. Askins?

A Not to he [sic] evaluate the claim, but which route to follow as far as whether to work out a cash settlement or one of these projected funded settlements.

Again, the attorney unequivocally testified that there was a separate check in the amount of $83,333 made payable to the attorney alone. This amounted to one-third of the entire settlement of $250,000. It was conceded clearly in the record that this was an unusual method of payment by using two separate checks.

Also, the record reveals that Ms. Jones was familiar with the duty of good faith and fair dealing. In fact, Ms. Jones acknowledged and recognized the duty of good faith and fair dealing in this situation under Article 21.21–2 of the Texas Insurance Code. That section, she acknowledged, was generally known as the "Unfair Claim Settlement Practices Act". The record reveals:

Q And is it your duty under that to not deceive a minor when you're dealing with her, from your understanding?

A As far as my understanding is, the article refers to not misleading or misrepresenting something or someone, as far as actions that I take, correct.

We find a pertinent question and answer in the record:

Q (By Mr. Bates) At the time you dealt with the people in this claim, did you feel that it was your duty to get the maximum protection for this child under your duty of good faith and fair dealing?

A Yes, sir.

Q And you so testified in your deposition?

A Yes, sir.

Nevertheless, there was no friendly suit filed in the district court. There was no guardian ad litem appointed to look into and to investigate and protect the true interests of the fifteen-year old child. Then the witness stated that she had testified on prior occasions that absent a friendly suit, that a case or claim may be reopened after a minor reaches the age of 18 years and can be filed thereafter during a two-year period of limitations immediately following the eighteenth birthday. TEX.INS.CODE ANN. art. 21.21–2 § 2 (Vernon Supp.1993).

The record is extended and lengthy in this case and it would serve no useful or pragmatic purpose to recite in great detail the voluminous testimony.

Significant and of paramount importance is the testimony of Ms. Jones conceding and

affirmatively stating that she (Ms. Jones) had a duty to obtain maximum protection for Paula. The "maximum protection" duty or standard, we think, would necessitate and mandate the filing of a so called "friendly suit". The suit of course should have and would have been filed in the district court. In the district court proceeding, the district judge would have appointed a guardian ad litem or an attorney ad litem to investigate thoroughly the claims and causes of actions and injuries and elements of damage that Paula could legitimately claim.

Upon a full dress hearing, the district judge aided and assisted by the attorney ad litem for Paula would then be in a position (with prudence and informed judicial discretion) to properly protect the true interests of Paula as well as the other parties involved. No such friendly suit was filed. The jury, under this record, could have given weight and probative evaluation to that factor.

Paula stresses and places major importance upon Plaintiff's Exhibit No. 19. Exhibit No. 19 is a letter from an attorney for Transport Insurance Company. The letter is dated May 18, 1989, and has a reference line "RE: Paula Trippel v. Transport Insurance Company." The letter contains a paragraph reading: "From an overall perspective, I still very much contemplate a 'united front' against Paula Trippel Faircloth in the present lawsuit, and look forward to working closely with your attorney." This letter was addressed to Mr. Troy Caldwell at a post office box in Colmesneil. The general thrust or purpose of the letter was that Transport Insurance Company wanted to be put in a strategic position to get access to 100 percent of the "law file" having been maintained by an attorney who had been the legal counsel for Rev. Caldwell, beginning at the time of the temporary guardianship. Another paragraph of the letter to Caldwell reads:

As per our telephone conversation, my client needs more than the formal paperwork utilized previously; we need 100% of every scrap of paper in Mr. Askins' file. Particularly, his hand-written notes regarding telephone conversations and any strategic thoughts he had are important. Accordingly, at your request, I have drafted a letter for your signature which can be hand-delivered to Mr. Askins. Unless I am mistaken in information I have been receiving both from Mr. Askins and from Plaintiff's counsel in the current Paula Trippel lawsuit, Mr. Askins definitely represented you at that time.

The writer of the letter, being the attorney for Transport Insurance Company, perhaps sums up the agreement in this following paragraph:

THE DEAL: In exchange for your cooperation in assisting my client thusly, Transport Insurance Company will finance separate legal counsel to represent you individually. This attorney will not have to take any sort of handling instructions from my client; he will answer only to you. The only specialized handling arrangements will involve him sending bills for his hourly fees and for expenses incurred on your behalf directly to my attention for submission to Transport Insurance Company.

In briefest sum, the jury could have weighed the evidence, determined that the insurance carrier through its employees or through agents and representatives had set out on a course of action to settle Paula's claim at the very lowest amount of damages possible and to accomplish this settlement as quickly as possible. The jury could have determined that the insurance carrier and those acting for it had mislead Paula into thinking that she was getting a very great deal and getting the top dollar. There is evidence that had Paula not taken this quick settlement that Paula, according to persons dealing with her, would get nothing. In other words, a $250,000 was a great deal and a very top dollar for the minor. The jury could consider all of these facts and surrounding circumstances in light of the fact that certain eminent defense counsel had evaluated the claim at half a million dollars. From the four corners and the totality of the record, the jury could properly have found and did find fraud.

Paula being a young girl of fifteen years, being without a home and without parents, simply was not in an equal position as to knowledge or as to experience in dealing with

the other actors or protagonists involved in the guardianship matter and the settlement proceedings. Paula, the jury could have determined, was in a much inferior and subordinate position. Jury findings have a special sanctity under the Texas Constitution; jury findings are to remain inviolate. TEX. CONST. art. I, § 15.

Thus, inter alia, the jury's answers and findings to question number three are supported by ample evidence of force and evaluation. Question number three inquired if, in connection with the settlement of Paula's claims any of the defendants were guilty of fraud. The jury found that Transport, Troy Caldwell, and Janet Jones were guilty of fraud. *See and compare Trenholm v. Ratcliff,* 646 S.W.2d 927 (Tex.1983). The inferences are strong. We cannot overthrow these findings.

Significantly the jury in response to question number four found that Transport, Lindsey & Newsom, Troy Caldwell, Janet Jones, and Mike Askins, engaged in a civil conspiracy to defraud Paula of the true value of her claims.

In response to question number seven, the jury found that certain actors—namely, Transport, Lindsey & Newsom, and Janet Jones—engaged in unconscionable action which was a producing cause of damages to Paula.

Much of the evidence discussed above was given by the defendants. Paula called numerous witnesses. Several experts were proffered. Trial lawyers of long experience testified.

A neuropsychologist, Dr. Richard Pollock, gave testimony. His opinion was to the effect that at the time of the double deaths, Paula was confronted by certain adults, namely Jones, Askins, and Caldwell. These adults were engaging in a course of conduct to bring about a settlement of Paula's claims. Paula, because of the exigencies of the circumstances, was in a trust-oriented situation toward the adult people in her life at that time. This neuropsychologist further opined that as a result of Paula's discerning that her trust had been violated, that she would, in reasonable probability, have a permanent impairment of her ability to develop normal relationships and to trust others in the future.

Another professional counselor of about 20 years experience in his field testified that Paula was in a susceptible and vulnerable position to almost anyone who might determine to take advantage of her situation. This counselor had treated Paula at some length. He opined that certain misleading and deceiving acts which were visited upon Paula had added to the emotional trauma and damage that she had suffered. He concluded that Paula would need future counseling.

Hon. Joe Smith, a resident attorney in Woodville, testified that he had practiced law for many years. Rev. Caldwell had contacted Joe Smith. Attorney Smith advised Caldwell that Paula would need protection to resolve the matter with the insurance carrier. Smith swore that Caldwell insisted that there would not be a law suit at the time and that "they" did not want a law suit or to have an attorney ad litem appointed. Smith was concerned that Paula would not be obtaining an impartial protection through a qualified guardian or attorney ad litem. Smith perceived that the matter would be handled in the county court. The presiding jurist there was not an attorney. Smith opined that no guardian ad litem would be appointed unless a specific request was made of the county judge to do so. Smith was not retained.

Attorney Joe Tonahill was called to the stand. Trial attorney Tonahill noted that an adjuster had obtained an opinion that the case was worth, at a conservative figure, half a million dollars. Attorney Tonahill's own opinion was that Paula's claim was worth $1,000,000 or slightly above, plus an additional $2,000,000 for punitive damages, making a total of $3,000,000 plus. The "rock bottom dollar" settlement value would approximate 1.25 million.

■ A former justice of the Texas Supreme Court was called to the stand as an expert witness. Testifying as an expert trial lawyer and jurist, Justice Robert Campbell had been elected to the Supreme Court of Texas and he had served as a justice on that court for about ten years. In 1988, he was

the senior justice of the Texas Supreme Court. This prominent jurist reentered the private practice by choice. Justice Campbell testified that the procedures required by law to protect a child (situated as Paula was situated) were not followed during the settlement procedures. The jurist stated that in his opinion there would be a conflict between the guardian and the ward. He testified that the mechanics of the settlement did not constitute a valid settlement. This former Supreme Court jurist explained that in his opinion the first step was a proceeding in the county court to see that the mechanics in the guardianship were properly in place. Nevertheless, a second procedure should take place. A "friendly suit" should be filed in the district court. This involves a proper final adjudication of the legal issues involved in the cause of action. In the district court certain issues or questions should have been addressed. Inter alia, where did the responsibilities for the collision lie? What had Paula lost? What will be her needs in the future? The "friendly suit" should be brought to permit the district judge to determine all the issues in the suit and the validity of the settlement procedures and the correctness of the settlement amounts so that there can be a final judgment and a final adjudication of these issues.

Further, it was Justice Campbell's opinion that, even assuming that the county court had the authority to adjudicate the issues in the law suit, the procedure used by the parties in the county court did not bring about a lawful, binding conclusion of the settlement because there had been no record made of the evidence. Hence, it is not shown how or upon what basis the county court acted. The rights of the little girl were not assured under the settlement agreement. In his experience of 27 years as both a lawyer and a jurist, Justice Campbell had not seen a settlement such as this settlement. We find in the record:

Q (By Mr. Chandler) Have you ever seen a settlement of a claim in your years of experience or heard of one where the lawyer representing the guardian, such as was the case here with Mr. Askins and Mr. Caldwell, where the lawyer got his fee paid separate by the insurance company directly to him?

A I have not, sir.

Justice Campbell testified that there should have definitely been a guardian ad litem appointed to represent the interest of Paula. The basis of his opinion was that Paula was a minor and did not have the legal capacity to employ an attorney or anyone else to properly watch over her true interest.

Paula's age of fifteen years was considered by the judiciary of Texas to be a person and age of tender years whose rights needed to be protected by the judiciary; but in this instance the attorney involved was employed by Caldwell. That attorney represented Caldwell. The attorney owed no duty or obligation under his own contract of employment with the guardian to affirmatively and independently protect the minor. Evidence exists that the guardian overcharged Paula for rent and food. But in a district court, the judge has the power and the duty to appoint a guardian ad litem or an attorney ad litem.

This officer of the court is someone who is independent of the parties. This guardian ad litem is independent of the insurance company; he is independent of the probate guardian; he is independent of the probate guardian's lawyer. This officer of the court focuses just on the rights and claims of the fifteen-year old girl.

In sum, Justice Campbell concluded that the insurance company had a duty to deal with this child fairly and honestly and in good faith. Once the choice was made by the carrier to deal with Paula, then a fiduciary relationship existed and the actors had the responsibility of dealing with the child of tender age in good faith. This fiduciary relationship involved a responsibility of the highest trust. The jurist testified that the insurance company had breached its duty. The jurist reiterated his conclusion that based on the facts presented the carrier breached its duty.

Based upon the record and based upon the specialized knowledge, experience, skill, training, and education of Justice Robert Campbell, his testimony was admissible inasmuch as the testimony would have assisted

the triers of fact to understand the evidence before them. *See* TEX.R.CIV.EVID. 702, 703, 704.

Honorable John Seale is a resident practicing attorney in Jasper, his professional expertise extending for 34 years. He has done extensive personal injury trial work. He was called as a witness. Attorney Seale testified that the method of settling Paula's claims in the initial stages were highly irregular and these irregularities removed the procedural safeguards to protect Paula's interest. He stated that the amount of the settlement figure was unreasonably low. Mr. Seale had reviewed the carrier's file and certain documents therein. This file had been in the possession of a Mr. Roggen, who was with the insurance company. In making a true evaluation of a claim as here, under certain circumstances (as revealed in the record), punitive damages must be considered and analyzed. The trial attorney was asked to examine and analyze the Plaintiff's Exhibit No. 2. This Exhibit No. 2 was from the claim file of the insurance company. The document had a date of June 1, 1984. The document had a recitation to this effect: "[W]e're concerned our driver may have pulled out to pass his preceding co-employee, realized there wasn't adequate distance, braked, and then jackknifed ... This, if a Plaintiff could prove, constitutes possible gross negligence and opens door for punative. [sic] Claimant's attorney hasn't mentioned this so far."

Attorney Seale's estimate of a settlement figure would be from $1,000,000 to $1,500,000 and that figure was considering only actual damages.

### Paula's Standing to Recover Under TEX.INS.CODE ANN. art. 21.21

■ The appellants in several points of error contend that Paula lacked standing to pursue claims under TEX.INS.CODE ANN. art. 21.21. We determine that Paula had proper standing. A litigant need not be an insured in order to assert an art. 21.21 cause of action against an insurance company. One need only to be a person who has been injured by an act proscribed by section 17.46 of the Texas Deceptive Trade Practices Act.

In *Aetna Cas. and Sur. Co. v. Marshall*, 724 S.W.2d 770 (Tex.1987), the Court wrote:

Section 16 of article 21.21 makes actionable any violation of Tex.Bus. & Com.Code Ann. § 17.46. Marshall alleged that Aetna violated section 17.46 by representing to him that it would provide benefits by the agreement and then failing to do so. Aetna argues that Marshall cannot recover under that statute because he is not a consumer of goods or services and because a court judgment is not an insurance policy. Article 21.21 does not incorporate the entire Deceptive Trade Practices Act which would require proof that Marshall was a consumer of goods or services. Instead, article 21.21 provides a cause of action to a person who has been injured by an insurance carrier who engages in an act proscribed by section 17.46.

*See Watson v. Allstate Ins. Co.*, 828 S.W.2d 423 (Tex.App.—Fort Worth 1992, writ granted).

■ TEX.INS.CODE ANN. art. 21.21 sets out a declaration of purpose. Article 21.21 § 1 declares that the purpose of this statute is to regulate trade practices in the business of insurance by defining, or providing for the determination of, all such practices which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting these trade practices as defined or determined. Section 2 mandates that "person" shall mean any individual, corporation, association or other legal entity engaged in the business of insurance, including agents, brokers, adjusters and life insurance counselors. Article 21.21 is to be liberally construed to promote the underlying purposes of that article. Section 3 provides that no person shall engage in any trade practice if defined or determined to be an unfair or deceptive act or practice in the business of insurance.

■ Section 16 of article 21.21 provides that any person who has sustained actual damages as a result of another's engaging in any act or practice declared in the rules or regulations of the State Board of Insurance to be unfair or deceptive acts or practices in the business of insurance or engaging in any

practice defined by section 17.46 of the Texas Business and Commerce Code, as amended, as an unlawful deceptive trade practice, may maintain an action against the person or persons engaged in such acts or practices. Thus, section 16 of article 21.21 also prohibits a person or an insurer from engaging in any practice defined by section 17.46 of the DTPA. This section 17.46 mandates that false, misleading or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful. Section 17.46(b) undertakes to list specific acts as being false, misleading or deceptive acts but this enumeration is not exhaustive. *Spradling v. Williams,* 566 S.W.2d 561 (Tex.1978). Section 17.46 encompasses any type of business activity. When an unlisted act or practice is alleged, the plaintiff-litigant must obtain a finding that the act or practice occurred and that it was deceptive. Paula obtained such findings.

■ Article 21.21 § 16 of the Texas Insurance Code makes actionable any violation of section 17.46 of the DTPA. *Aetna Cas. and Sur. Co. v. Marshall, supra.* Hence, section 16 of article 21.21 includes and incorporates any unlisted practice that is determined to be false, misleading or deceptive. *See Allstate Ins. Co. v. Kelly,* 680 S.W.2d 595 (Tex.App.—Tyler 1984, writ ref'd n.r.e.).

The jury found that:

(1) Transport failed to act in good faith regarding the value of Paula's claim which was a producing cause of damages to her;

(2) Transport and Caldwell breached their fiduciary duty to Paula causing damages to her;

(3) Transport, Caldwell, and Jones were guilty of fraud in connection with the settlement of Paula's claims;

(4) Transport, Lindsey & Newsom, Caldwell, Jones, and Askins engaged in a civil conspiracy to defraud Paula of the true value of her claims;

(5) Transport, Lindsey & Newsom, Caldwell, and Jones engaged in false, misleading or deceptive acts or practices that produced damages to Paula;

(6) Transport, Lindsey & Newsom, and Jones engaged in unconscionable action and course of action against Paula; and,

(7) Transport, Lindsey & Newsom, and Jones knowingly engaged in certain conduct that was a producing cause of damages to Paula.

The jury found that the defendants engaged knowingly in the false, misleading and deceptive acts or practices; and that certain defendants knowingly engaged in the unconscionable action or course of action that produced damages to Paula. Article 21.21 § 16(b).

Thus, Paula had proved up a cause of action under article 21.21, section 16 of the Insurance Code by pleading and proving and obtaining jury findings that Transport and others had committed an unlisted deceptive trade practice under sections 17.46 and 17.50 of the DTPA. Paula has secured the benefit of the definition of an "unfair claim settlement practice" under article 21.21–2 of the Insurance Code, section 2(a), (b) and by invoking article 21.21 section 16 of the Insurance Code. Article 21.21–2 is properly efficacious for purposes of determinations of law and definitions. This theory of recovery possesses vitality and is efficient by incorporating article 21.21 § 16 of the Insurance Code with 28 Tex.Admin.Code § 21.203 (West 1988) (State Bd. of Ins.).

It must be stressed that there was a course of action involving numerous acts, actions, and conduct in dealing with Paula. 28 Tex.Admin.Code § 21.3 prohibits any person from engaging in an unfair or deceptive act or practices as defined by the provisions of the insurance code or as defined by the sections and other rules and regulations of the State Board of Insurance. Further, this section 21.3 provides that irrespective of the fact that the improper trade practice is not defined in any other section of these rules and regulations, no person shall engage in any trade practice which is determined pursuant to law to be an unfair or deceptive act or practice in the business of insurance.

Any person connected with an insurer is prohibited from engaging in any deceptive acts or practices in the business of insurance. 28 Tex.Admin.Code §§ 21.1, 21.2, 21.3.

In the case sub judice there has been a determination pursuant to law that an unfair trade practice and unfair and deceptive acts have been committed, according to the jury verdict, adverse to Paula. Our Ninth Court of Appeals, adhering to Supreme Court precedents, determines that defendants' conduct constitutes unfair or deceptive acts. *Vail v. Texas Farm Bureau Mut. Ins. Co.,* 754 S.W.2d 129 (Tex.1988); *Aranda v. Insurance Co. of North America,* 748 S.W.2d 210 (Tex. 1988); *Arnold v. National County Mutual Fire Ins. Co.,* 725 S.W.2d 165 (Tex.1987).

Paula had standing under the expert testimony of Justice Robert Campbell. She also had standing under article 21.21 of the Texas Insurance Code. *Watson v. Allstate Ins. Co., supra.*

It must be remembered and stressed that Paula obtained a favorable finding to question number five. In five, the jury determined that Transport, Lindsey & Newsom, Caldwell, and Jones engaged in false, misleading or deceptive acts or practices that were a producing cause of damages to Paula. Question five comports to PJC 102.01, 4 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES, (1990). The instruction or definition in question number five comports to PJC 102.05. Also, the instruction in question five is in harmony with DTPA § 17.46(b)(23). The language of the instructions follows the section closely. Our Supreme Court has held that the wording may be altered slightly to conform to the evidence before the jury. *See Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931 (Tex.1980). Hence, under this theory of recovery which incorporates the DTPA section into article 21.21, judgment for Paula was legally correct since she had standing under article 21.21.

■ As well, Paula was authorized to recover judgment in view of question number three wherein the jury found that Transport and Jones were guilty of fraud. Fraud here was submitted as common law fraud. A common law cause of action can serve as the foundation for violation under section 17.46 of the DTPA, but also under article 21.21, section 16, of the Insurance Code. Under this section 16(b), a plaintiff who prevails is entitled to recover actual damages. If the jury finds that the defendants knowingly committed the acts complained of, then section 16(b) provides that the court shall award, in addition, two times the amount of actual damages. The jury found that Transport, Lindsey & Newsom, and Jones engaged in such conduct knowingly and that "knowingly" means actual awareness of the falsity, deception and unfairness of the conduct in question.

■ Again, the jury found that the defendants joined in a civil conspiracy to defraud Paula. The co-conspirators are liable for the consequences of their actions. And a co-conspirator is liable for the actions of other co-conspirators resulting from the consequences of the conspiracy, including fraud. Under this record we conclude that Paula had the right to make the election to sue for damages. We conclude that Paula has demonstrated her entitlement to additional damages. She is entitled to recover attorneys' fees. Contingent fees are upheld in cases brought under a statute that allows for the recovery of attorneys' fees. Article 21.21 § 16(b) authorizes a reasonable and necessary attorney's fee.

■ We conclude that the trial judge did not err in excluding evidence of Paula Trippel's pedigree. Evidence as to whether Judith was the natural mother of Paula or the adoptive mother would not have enabled the jury to answer any question submitted. Any exclusion of this evidence was harmless. This action by the trial judge was not reasonably calculated to cause nor did it probably cause a rendition of an improper judgment in this case under this record. This evidence was properly excluded under the "picture frame" theory as set out in *Viles v. Security Nat. Ins. Co.,* 788 S.W.2d 566 (Tex.1990). The *Viles* opinion was based upon the Supreme Court's recognition of a common law tort action for breach of the duty of good faith and fair dealing as set out in *Arnold, supra,* and certain subsequent cases.

■ The prejudgment interest provided for in the judgment was calculated by compounding the interest annually. The prejudgment interest should have been calculated as simple interest under the statute. Paula concedes that compounding the interest annually was erroneous. The judgment

is reformed to the extent, but only to the extent, of reducing the prejudgment interest to $64,922.80. In view of the above writing, we overrule the appellants' point of error number one. Points of error two, four, five, six, seven, and eight are overruled. Points two, three, four, six, and seven are no evidence points. Point of error three is not determinative or dispositive of this. appeal. The computation of the prejudgment interest has been corrected and reformed. Thus, appellants' point of error nine requires no further action by us. These numbered points refer to the points of error brought by the appellants Lindsey & Newsom Claim Services and Janet E. Jones.

Appellant Transport Insurance Company urges a different point of error number one. This point lacks merit and is overruled. Also, Transport's points of error two, three, four, five, six, seven, eight, nine, ten, and eleven are overruled based on the opinion above. Transport's point of error six is not dispositive nor controlling of this appeal. Point of error twelve deals with prejudgment interest; this interest award has been corrected. Twelve is now moot.

Originally this opinion was ordered: "Do Not Publish". Appellants filed a motion requesting publication; we granted same.

The judgment below is REFORMED as to the computation of the prejudgment interest, and as REFORMED, it is AFFIRMED.