**TACON MECHANICAL CONTRACTORS, INC., et al., Plaintiffs,**

v.

**AETNA CASUALTY AND SURETY COMPANY, Defendant.**

**Civ. A. No. 93–1675.**

United States District Court, S.D. Texas, Houston Division.

Aug. 16, 1994.

Eric G. Carter, Houston, TX, for Tacon.

Thomas Randolph Cooper, Houston, TX, for Walsh & Albert.

Stephen Pate, Houston, TX, for defendant.

OPINION ON PARTIAL SUMMARY JUDGMENT

HUGHES, District Judge.

### 1. *Introduction.*

In this dispute over a government construction project, a subcontractor and a sub-subcontractor are dissatisfied with the promptness of the surety's payment on the bond. Because the federal law preempts their state law causes of action and because they otherwise may not assert those claims, the causes of action will be dismissed.

### 2. *Facts.*

Menendez–Donnell contracted with the United States to improve the Naval Reserve Readiness Center. Tacon serves as subcontractor for some of the labor and materials, and it, in turn, subcontracted the sheetmetal ductwork to Walsh & Albert. Aetna was chosen as the surety on the project and issued a statutory payment bond. 40 U.S.C. § 270a et seq. (1993) (the Miller Act).

Menendez–Donnell was also a subcontractor on another government construction project, improvements at the City of Houston's Hobby Airport. In a dispute with the contractor on that project, Menendez–Donnell won a substantial arbitration award against Cardkey Systems. The funds found their way into the registry of this court when the parties with various interests in the money could not agree on their rights to the funds. The claimants include the surety, Aetna, and the holder of a Menendez–Donnell note, Sterling Bank.

At the same time, Menendez–Donnell could not pay its subcontractors on the Naval Reserve contract, and Tacon and Walsh & Albert resorted to the bond. When Aetna was slow in paying, they filed suit.

### 3. *Remaining Claims.*

With the cajoling of this court, the parties were able to get the paper work straightened out, and the only dispute remaining on the

bond itself is $7,850.92. Additionally, the parties to the Hobby Airport project settled, and the cash in the registry of the court has been disbursed. The subject of this opinion is the claim by Tacon and Walsh & Albert that Aetna's slowness in paying the bond claims violates state laws sounding in tort. For those claims to remain, the plaintiffs must show that (a) the congressional enactment does not preempt state law claims and that (b) the plaintiffs as third-party beneficiaries to the contract between Aetna and Menendez–Donnell may bring those claims.

4. *Miller Act Preemption.*

■ Suppliers of labor or materials on a private construction project can protect their interest by perfecting a mechanics lien against the improved property. State law gives this lien one of the highest priorities. Because a state-law lien cannot attach to property of the national government, the suppliers are deprived of their usual security. The federal law solves this problem with an alternative remedy; federal law requires the contractor to obtain a payment bond to protect the rights of the suppliers. *See generally F.D. Rich Co. v. United States for use of Indus. Lumber Co.,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974).

■ The federal statutory scheme preempts remedies under state lien statutes. *See, e.g., Continental Casualty Co. v. United States for use of Robertson Lumber Co.,* 305 F.2d 794 (8th Cir.1962). Congress has acted to regulate the liabilities of contractors so that the government's cost is defined and predictable; the government ultimately bears the cost of the payment bond, but it is free of the entanglements of local lien statutes. It was willing to bear the bond cost because, if it had left the subcontractors insecure, its cost would eventually rise to cover the subcontractors risk of loss through higher subcontractor and contractor bids.

■ Part of the thrust of the enactment is to avoid having the costs of local risk-increasing rules imposed on national government subcontractors. On construction projects for the federal government the remedies available in an action arising out of the bond should be nationally uniform. *See F.D. Rich,* 417 U.S. at 126–31, 94 S.Ct. at 2163–66.

State law has no authority to enlarge the liabilities of a surety under a bond issued to comply with a federal statutory bond requirement. *See United States for Use of Getz Bros. & Co. v. Markowitz Bros. (Delaware) Inc.,* 383 F.2d 595 (9th Cir.1967). What is uncertain is whether that rationale produces the conclusion that the federal bond requirement preempts all state-law claims arising out of a the performance of a surety on a federal construction project. *Compare K–W Indus. v. National Sur. Corp.,* 855 F.2d 640 (9th Cir.1988) and *United States ex rel. Sunworks Div. of Sun Collector Corp. v. Insurance Co. of North America,* 695 F.2d 455 (10th Cir.1982) (no general preemption) *with United States for use of Pensacola Constr. Co. v. St. Paul Fire & Marine Ins. Co.,* 710 F.Supp. 638 (W.D.La.1989) (blanket preemption).

Federal preemption may be established by Congress explicitly, through a scheme of federal regulation, or implicitly, if state law conflicts impede "the accomplishment and execution of the full purposes and objectives of Congress." *See Pacific Gas and Electric Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). The intent of Congress inferable from its actual enactment is the critical issue. *See California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 275, 107 S.Ct. 683, 686, 93 L.Ed.2d 613 (1987).

The Miller Act says nothing about preemption. *See* H.R.Rep. No. 1263, 74th Cong., 1st Sess. 1 (1935). In fact, the sparse legislative history gives us no guidance towards Congress's intention about the scope and application of the act under these circumstances. It is known that the Miller Act as written gives some express protection to sureties as well as to the subcontractor.

The venue provisions that mandate venue in a federal district court where the contract was to be performed protect the surety. 40 U.S.C. § 270b(b) (1993). *See United States Fidelity & Guaranty Co. v. Hendry Corp.,* 391 F.2d 13 (5th Cir.), *cert. denied,* 393 U.S. 978, 89 S.Ct. 446, 21 L.Ed.2d 439 (1968). Congress intended to protect sureties from multiple suits in state court that might lead to liability in excess of the payment bond.

*See id.* at 19; *United States ex rel. Aurora Painting, Inc. v. Fireman Fund's Ins. Co.,* 832 F.2d 1150 (9th Cir.1987).

The purpose of a Congressional act may also be ascertained by examining administrative regulations for indications that the act creates a scheme of regulation so comprehensive that no room remains for state regulation. *See California Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987); *Hillsborough County v. Automated Medical Lab., Inc.,* 471 U.S. 707, 717, 105 S.Ct. 2371, 2377, 85 L.Ed.2d 714 (1985).

Treasury Department regulations require Miller Act sureties promptly to honor their bonds, and they create procedures for review of delinquent sureties. The department has the authority to revoke a surety's certificate of authority. 31 C.F.R. § 223.18. These regulations are strong evidence that Congress intended the performance of a surety to be assessed administratively rather than by the application by a federal court of the great variety of state-law causes of actions that expand the scope of the surety's potential liability. *But see Alvarez v. Insurance Co. of North America,* 667 F.Supp. 689, 694–95 (N.D.Cal.1987).

When the Miller Act was passed in 1935, the type of claims asserted by the plaintiffs today were not available. If the proliferation of state regulations had been an element of the context of performance bond pricing, Congress might have appreciated that threat to Congress's attempt to establish an orderly and comprehensive federal scheme for protecting materialmen and sureties alike. To read the Miller Act as limiting the government's own contracting costs through solely protecting the subcontractors, gives subcontractors both a federal scheme of assurance and the states' pattern of remedies and ignores that the act regulates sureties to further the purpose of reducing costs. The Miller Act preempts the plaintiffs' state law claims.

5. *The State–Law Claims.*

If the claims are not preempted, the plaintiffs assert claims for a breach of the duty of good faith and fair dealing, claims under the Texas Insurance Code, vexatious failure to pay, and tortious interference with contract.

A. *Good Faith and Fair Dealing.*

■ The duty of good faith and fair dealing arises out of the "special relationship" between the insurance company and the insured. *Arnold v. National County Mutual Ins. Co.,* 725 S.W.2d 165 (Tex.1987). Texas law simply does not imply this relationship into ordinary contracts, and absent the special relationship a contract will not give rise to damages in tort. Payment bonds do not imply a relationship at all similar to the one implied by a worker's compensation policy.

Simply put, the special relationship does not exist between Aetna and third party bond claimants. Only Menendez–Donnell can bring this claim, and it has not.

B. *The Texas Insurance Code.*

■ Similarly, the plaintiffs have no standing to bring a claim under the insurance code. Aetna's status as a surety makes it covered under the code. Tex.Ins.Code Ann. art. 1.14–1, § 2(a) (1982). Aetna's status, however, says nothing about the plaintiffs' status to take advantage of the code's projections. It is clear that as third-party bond claimants they do not have standing under the insurance code. *See Allstate Ins. Co. v. Watson,* 876 S.W.2d 145 (1994).

C. *Vexatious Failure to Pay.*

■ To the extent that this claim is cognizable under Texas law, it is specifically preempted by the Miller Act. Its only conceivable application could be a claim for attorney's fees, and federal law applying the statute covers that ground. *F.D. Rich,* 417 U.S. at 129, 94 S.Ct. at 2165.

■ Under the federal law, attorney's fees are allowed where the party acted in vexatiously or oppressively. *Id.* While the court agrees that the certain claims should have been paid with more dispatch, both the inability of all of the contractors to submit complete applications for payment as well as the animosity that developed among the lawyers mitigate Aetna's tardiness. In no event does Aetna's conduct stoop to the level required to award attorney's fees.

D. *Tortious Interference with Contract.*

Tacon contends that Aetna's slowness in paying interfered with its ability to pay its subcontractors. Because none of the other claims has merit, Aetna could not have tortiously interfered with Tacon's relationship with its subcontractors.

6. *Conclusion.*

The scheme created by Congress successfully protects the interests of all involved in the construction of government works; preemption makes sure that it continues to succeed. Tacon and Walsh & Albert will take nothing on their state law claims.

PARTIAL SUMMARY JUDGMENT

1. The Walsh & Albert Company takes nothing from Aetna Casualty and Surety Company. (# 56–2)

2. Tacon Mechanical Contractors Incorporated takes nothing from Aetna Casualty and Surety Company on its state law claims. (# 56–1)

3. Tacon shall inform the court by September 5, 1994, if a dispute remains on its claim on the payment bond and how it proposes to proceed.