**ASSOCIATED INDEMNITY CORPORA-TION, and Fireman's Fund Insurance Company, Appellants,**

v.

**CAT CONTRACTING, INC., GTS Equipment, Inc., Michigan Sewer Construction Co., Construction Equipment Co., Mario Diponio, Benjamin Diponio, Phyllis Diponio, Guilio Catallo and Rosemary Catallo, Appellees.**

No. 13–93–621–CV.

Court of Appeals of Texas, Corpus Christi.

Feb. 22, 1996.

Rehearing Overruled March 28, 1996.

---

David C. Mattax, Asst. Atty. Gen., Financial Litigation Div., Austin, Christina Stone,

Ogden, Lieberman, Gaughan & Stone, Houston, amicus curiae.

James A. Knox, D. Bradley Dickinson, Vial, Hamilton, Koch & Knox, Dallas, Kenneth P. Kosut, C.L. Crawley, Evans & Kosut, Houston, Joseph A. Rodriguez, Rodriguez, Colvin & Chaney, Brownsville, Laird E. Lawrence, Vial, Hamilton, Koch & Knox, Houston, for appellants.

Edward A. Stapleton, III, Frank Costilla, Costilla & Stapleton, Brownsville, Tom Lockhart, Juan A. Gonzalez, Roger W. Hughes, Adams & Graham, Harlingen, for appellees.

Before DORSEY, YAÑEZ and RODRIGUEZ, JJ.

## OPINION

YAÑEZ, Justice.

This appeal involves a dispute between a surety and its principal. Associated Indemnity Corporation ("Associated") issued performance and payment bonds when CAT Contracting and Michigan Sewer entered into a contract with the Cameron County Water District Board (the "District") for construction of eight miles of water pipeline. Associated sued CAT Contracting, Michigan Sewer, GTS Equipment, Construction Equipment, Mario, Phyllis and Benjamin Diponio, and Guilio and Rosemary Catallo (collectively "Joint Venture") after it paid the District an agreed sum under the performance bond. Associated sought recovery from Joint Venture under a general indemnity agreement for $835,300.80.

Joint Venture countersued Associated for breach of contract, breach of fiduciary duties, breach of the duty of good faith, tortious interference with contract, common law fraud, violations of the D.T.P.A., and violations of the Texas Insurance Code. After a bench trial, the trial court entered a judgment in favor of Joint Venture and awarded $425,579.67 in actual damages, $1,676,271.00 in lost profits to CAT Contracting, $2,489,034.00 in lost profits to Michigan Sewer, $700,000 in mental anguish damages, and held that Associated was not entitled to indemnification. By thirty-five points of error, Associated and Fireman's Fund Insurance Company challenge the trial court judgment. Associated asserts that the trial court erred in finding that it owed duties to Joint Venture and that the evidence is legally and factually insufficient to support the judgment. By a single crosspoint, Joint Venture argues that the trial court erred by not applying the mandatory trebling provision of the Texas Insurance Code to the judgment. We reverse and render in part, modify in part, and affirm in part.

## BACKGROUND

In 1988, Joint Venture bid on a public works project in Cameron County, Texas. The District accepted their bid, and Joint Venture signed a contract for the construction of eight miles of concrete water pipeline. Joint Venture was required, however, to supply the District with performance and payment bonds associated with their contract. Joint Venture secured the bonds on June 29, 1988. Associated executed the bonds as surety. Joint Venture executed the bonds as the principal and named the District as the obligee or sole beneficiary. To secure the bonds, Associated required Joint Venture to enter into a general indemnity agreement. Under this agreement, Joint Venture promised to indemnify Associated for any loss it sustained due to Joint Venture's performance of the contract with the District. Associated required the five individuals named in this suit to sign the indemnity agreement.

The construction contract provided that Joint Venture was to begin work on August 29, 1988. The project was to be performed within 300 days. Yet, before construction could begin, the District informed Joint Venture that there had been problems with the bidding process and that the contract would have to be put out for re-bid. Sometime following that instruction, however, the District informed Joint Venture that it could proceed with construction.

Shortly thereafter, Joint Venture began to excavate the soil where the pipeline was to be placed. Joint Venture then sent a letter to the District's engineer expressing concern that the soil and gravel bedding was too unstable for concrete pipeline. Section 3.03 of the construction contract provided that any design errors in the pipeline plan would

be the responsibility of the District. Joint Venture contends that because of the soil's make-up, the joints needed for the concrete pipeline would rupture when the concrete lines settled. Joint Venture claims that the concrete pipe was improper for the soil they encountered and that the bedding design was flawed. The District's engineer, however, ordered Joint Venture to continue with construction despite the possible design error. Joint Venture then experienced several problems with the project which led to delays and extra work. Joint Venture encountered an unidentified resaca[1] and unmarked underground utilities. Notwithstanding the delays, Joint Venture completed installation of the eight miles of concrete pipeline. Construction was not completed within the original 300 day deadline. Joint Venture argues that they were assured by the District's engineer that extension days would be granted by the District due to weather delays and problems beyond their control.

In July 1990, Joint Venture pressure tested the completed pipeline and fourteen leaks were found. The District demanded that Joint Venture repair them. At this time, Joint Venture had not received payments from the District in eight months and believed that they were owed over $400,000.00 under the contract. Joint Venture also asserted that the leaks were caused by the design failure associated with concrete lines in this type of soil. Thus, Joint Venture sought additional payment for any repairs it made to the pipeline. The District's engineer again disagreed with Joint Venture's contentions and continued to demand that Joint Venture repair the line. Joint Venture asserts that at this time the parties agreed to arbitrate the dispute pursuant to the construction contract.

In spite of that alleged arbitration agreement, on August 13, 1990, the District issued a 10–day cure notice to Joint Venture and Associated. On August 30, 1990, Joint Venture wrote the District's engineer mentioning arbitration, but Joint Venture did not request it. On August 31, 1990, the District issued a

"Notice of Default," and demanded that Associated fulfill its statutory obligations under the performance bond. After the notice of default was sent, Associated joined the dispute and began its own investigation. On September 11, Associated met with Joint Venture's officers, and it was at this meeting that Associated allegedly made several misrepresentations to Joint Venture. Joint Venture contends that at the meeting Associated represented that the two were a "team," that Associated would act only in Joint Venture's best interest, and that Associated would keep all of Joint Venture's parties informed.

In order to investigate the pipeline and to minimize liquidated damages under the construction contract, on September 25, 1990, Associated proposed that the leaks be repaired with a full reservation of rights for all parties. Joint Venture offered to make the repairs because its equipment and crews were already in place, but neither Associated nor the District accepted that offer. On October 18, 1990, Associated entered into a time and materials contract with another local contracting company, Mercer & Ussery ("Mercer"), for repair of the leaks. The repair work began in November 1990 and was not completed until February 1991. Mercer sought to charge Associated $242,-123.00 for repair of the leaks. Another pressure test was conducted on March 11, 1991. An additional twelve leaks were discovered after Mercer's repairs.

On September 25, 1990, Joint Venture formally demanded arbitration with the District. On October 8, 1990, the District refused to submit to arbitration. The District claimed that Joint Venture had made an untimely demand under the terms provided in the construction contract. Joint Venture made no other attempt to enforce its arbitration rights.

In May 1991, after the Mercer repairs, Associated entered into settlement negotiations with the District. Joint Venture continued to claim that there were design defects in the construction plan, but they failed to

---

1. A "resaca" is a body of water created as an overflow basin for the Rio Grande.

show or convince Associated. Associated met with the District to present three settlement alternatives, but did not inform Joint Venture. In July 1991, Associated agreed to pay the District $380,000.00 for a complete release as to all further costs or damages associated with Joint Venture's construction contract; Associated secured a release for itself, but not for Joint Venture. Associated also agreed to allow the District to keep the funds retained under the contract. This "retainage" money was the amount the District had yet to pay Joint Venture for its construction work. It amounted to approximately $425,500.00. Associated contends that the settlement agreement specifically reserved all of Joint Venture's rights against the District. Joint Venture, on the other hand, claims that Associated left it out of the settlement negotiations, failed to secure its arbitration rights, failed to keep it informed, failed to assert its claim of design failure with the District, and failed follow its own internal procedures. The settlement with the District, Joint Venture claims, has adversely affected their ability to secure additional bonds and additional construction work. After settling with the District, Associated demanded indemnity in the amount of $835,000.00 from Joint Venture. This suit followed when Joint Venture refused to indemnify and brought its own claims against Associated.

## PARTIES TO THE JUDGMENT

By point of error one, Associated argues that the trial court erred by entering judgment against Fireman's Fund Insurance Company. Although the trial court found that Associated and Fireman's Fund were "one and the same for purposes of this lawsuit" and that they were "inextricably intertwined," Joint Venture did not name Fireman's Fund in its pleadings nor did Joint Venture plead alter ego or seek to pierce the corporate veil. Joint Venture argues, however, that because counsel for Associated remarked during opening statement that "[t]he plaintiff, Associated Indemnity Company and Fireman's Fund are basically one and the

same," Fireman's Fund judicially admitted that it was before the court. Joint Venture further argues that Fireman's Fund submitted itself to a trial by consent from the comment and because several of its employees testified at trial.

In no case shall a judgment be rendered against any defendant unless upon service, or acceptance or waiver of process, or upon an appearance. TEX.R.CIV.P. 124; *Mapco, Inc. v. Carter,* 817 S.W.2d 686, 687 (Tex.1991). Judgment may, however, be rendered against a party who waives service by making a general appearance. *Werner v. Colwell,* 909 S.W.2d 866, 869 (Tex.1995). We find no evidence in this case that Fireman's Fund was served, accepted or waived process, or made an appearance. *See* TEX. R.CIV.P. 120. A comment by Associated's counsel that it is one and the same as Fireman's Fund is not a judicial admission by Fireman's Fund. Further, simply because Fireman's Fund's employees testified at the trial and were a part of the surety's investigation does not release Joint Venture from either naming Fireman's Fund as a party to the suit or alleging alter ego or piercing the corporate veil. *See Mapco,* 817 S.W.2d at 687–688. As in *Mapco,* there is no evidence that the parties actually tried these issues in the trial court. *Id.* at 688. Further, Fireman's Fund did not make a general appearance through Associated's attorney, nor did Fireman's Fund make a general appearance merely by having its employees testify at trial. *Werner,* 909 S.W.2d at 869. Point one is sustained. We reverse the judgment and render that Joint Venture take nothing from Fireman's Fund.

## STANDARD OF REVIEW

Associated's remaining points of error challenge the trial court's findings of duty and challenge the sufficiency of the evidence. Findings of fact entered in a case tried to the bench are of the same force and dignity as a jury's finding. *Guerra v. Garza,* 865 S.W.2d 573, 575 (Tex.App.—Corpus Christi 1993, writ dism'd w.o.j.); *City of Clute v. City of Lake Jackson,* 559 S.W.2d 391, 395 (Tex.Civ.

App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). The trial court's findings are reviewable for legal and factual sufficiency of the evidence to support them. *Southern States Transp., Inc. v. Texas,* 774 S.W.2d 639, 640 (Tex.1989); *Blanco v. Gracia,* 767 S.W.2d 896, 897 (Tex.App.—Corpus Christi 1989, no writ).

When we review a "no evidence" or legal sufficiency of the evidence point, we consider only the evidence and reasonable inferences that tend to support the jury's finding, and we disregard all evidence and inferences to the contrary. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.,* 774 S.W.2d 666, 668 (Tex.1989). We overrule the point and uphold the finding if we find any evidence to support the finding. *Southern States Transp.,* 774 S.W.2d at 640. However, "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983). When we review an "insufficient evidence" or factual sufficiency of the evidence point, we consider, weigh, and examine all of the evidence which supports or undermines the jury's finding. *Plas-Tex, Inc. v. United States Steel Corp.,* 772 S.W.2d 442, 445 (Tex. 1989). We set aside the verdict only when we find that the evidence standing alone is too weak to support the finding or that the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

The trial court's conclusions of law are always reviewable. *Westech Eng'g. v. Clearwater Constructors,* 835 S.W.2d 190, 196 (Tex.App.—Austin 1992, no writ). We review the court's conclusions of law to determine their correctness. *Mercer v. Bludworth,* 715 S.W.2d 693, 697 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.), *overruled on other grounds by, Shumway v. Horizon Credit Corp.,* 801 S.W.2d 890, 894 (Tex.1991). Conclusions of law may not be reversed unless they are erroneous as a matter of law. *Id.*

## BREACH OF CONTRACT

By points of error two through twelve, Associated challenges the trial court's finding concerning breach of the general indemnity agreement. Associated argues that this case merely involves a contract dispute. Associated claims that it is entitled to indemnification under its general indemnity agreement with Joint Venture because it was bound to pay the District under its obligation under the performance bond. In this case, the trial court found that Associated breached its contract with Joint Venture under the general indemnity agreement and was, therefore, not entitled to reimbursement from Joint Venture. The trial court also entered a finding that Associated acted in bad faith when investigating and settling the claims with the District and wilfully disregarded and refused to learn the facts at hand. The trial court also found that Associated acted as a volunteer; therefore, they made voluntary payments to the District and were not entitled to indemnification.

Whether the surety or his principal is liable on the bond paid by the surety is generally immaterial to whether the principal must indemnify the surety. *Ford v. Aetna Ins. Co.,* 394 S.W.2d 693, 698 (Tex.Civ.App.—Corpus Christi 1965, writ ref'd n.r.e.). To recover under an indemnity agreement, the settling indemnitee must prove his potential liability as well as the reasonableness of the settlement between himself and the obligee. *Delta Eng'g Corp. v. Warren Petroleum,* 668 S.W.2d 770, 772 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Joint Venture argues, however, that its indemnity agreement required Associated to act with good faith in settling and managing claims made by the District. Associated's representatives conceded this fact at trial. Joint Venture points to the following language in the agreement:

8. The Surety shall have the exclusive right to decide and determine whether any claim, liability, suit or judgment made or brought against the Surety or

the indemnitors or any one of them on any such bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, and the Surety's decision thereon, *if made in good faith,* shall be final and binding upon the indemnitors. An itemized statement of the payments by the Surety for any of the purposes specified herein, sworn to by an officer of the Surety, or the voucher or vouchers for such payments, shall be *prima facie evidence* of the liability of indemnitors to reimburse the Surety for such amounts, with interest. (Emphasis added).

▇▇▇ Although Associated argues that it is automatically entitled to indemnification because it made payments under its bond obligation to the District, the agreement it required Joint Venture to sign suggests another answer. A contract for indemnity is read as any other contract. *Safeco Ins. Co. of Am. v. Gaubert,* 829 S.W.2d 274, 281 (Tex. App.—Dallas 1992, writ denied). The indemnity agreement governs the parties' rights and obligations, and indemnity agreements are strictly construed in favor of the indemnitors. *Id.* The nature of an indemnitor's liability upon an indemnity contract is determined by the agreement's provisions. *Central Sur. & Ins. Corp. v. Martin,* 224 S.W.2d 773, 776 (Tex.Civ.App.—Beaumont 1949, writ ref'd).

The language of the contract here sets out that the surety makes a prima facie showing of indemnification when it presents a sworn statement of payment. It then becomes Joint Venture's burden to overcome that showing and prove its defense. *See Delta Eng'g,* 668 S.W.2d at 772; *Martin,* 224 S.W.2d at 777 (burden of establishing defense on the indemnitor). Associated argues that Joint Venture's only defense to indemnification occurs, according to our previous decision in *Ford,* if Associated acted in bad faith or with fraud. In *Ford,* we stated that in order for a principal to avoid summary judgment in favor of a surety who sought reimbursement under a general indemnity agreement, the principal was required to raise, as an affirmative defense, an issue as to the surety's bad faith. *Ford,* 394 S.W.2d

at 698. Under the agreement here, unlike *Ford,* Associated is contractually required to act in good faith before Joint Venture will be held liable for Associated's decision to pay the District's claim. *See id.* ("as the parties bind themselves, so shall they be bound") (quoting *English v. Century Indem. Co.,* 342 S.W.2d 366, 369 (Tex.Civ.App.—San Antonio 1961, no writ); *Martin,* 224 S.W.2d at 776); *cf. Safeco,* 829 S.W.2d at 282 (so long as settlement in good faith, a surety is entitled to indemnification).

▇▇▇ Associated also argues that even when "good faith" is required in an indemnity contract, fraud must be proven to show a lack of that good faith. Associated points to *Martin* as supporting this standard. We disagree. *Martin* held that where an indemnity agreement required good faith, an indemnitor could defeat the duty to reimburse if it pleaded and proved "fraud *or* want of good faith." *Martin,* 224 S.W.2d at 777 (emphasis added). In *Martin,* the court merely found that the indemnitor failed to plead and offered no evidence on either of those defenses. *Id.* Here, Joint Venture tendered the issues of bad faith and lack of good faith. Further, while it is sufficient for the settling indemnitee to show a potential liability, the settlement must also have been reasonable, prudent, and in good faith. *Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co.,* 490 S.W.2d 818, 824 (Tex.1972). Thus, the question before us is whether Joint Venture sufficiently proved that Associated did not act in good faith when it made payments relating to the performance bond and when settling the District's claim.

The general indemnity agreement at issue in this case does not define the "good faith" that Associated was required to exercise. The issue of "good faith" in the surety and principal context has also not been specifically addressed by Texas courts. Joint Venture argues that "good faith" requires Associated to give equal weight to the interests of the principal and the obligee when investigating, defending, and settling a claim with the District. Within this tripartite relationship between a surety, principal, and obligee, one court has determined that in order to prove lack of good faith of a surety, a principal in

defending against the surety's claim under an indemnity agreement must prove that the surety "failed to make a reasonable investigation of the validity of the claims against them or to consider reasonably the viability of their counterclaims and defenses." *City of Portland v. G.D. Ward & Assoc.*, 89 Or.App. 452, 750 P.2d 171, 175, *rev. den.*, 305 Or. 672, 757 P.2d 422 (1988); *see also United States v. D Bar D Enter., Inc.*, 772 F.Supp. 1167, 1170 (D.Nev.1991); *Windowmaster Corp. v. Morse/Diesel*, 722 F.Supp. 1532, 1533–34 (N.D.Ill.1988) (good faith provision in contract required surety to conduct reasonable investigation and to give the interests of the principal equal consideration with its own). The principal is not required to prove that the surety acted for dishonest purposes or with improper motives. *City of Portland*, 750 P.2d at 175.

 Thus, a surety acts in good faith only after it makes a reasonable investigation of the claims, counterclaims, and defenses in the underlying action. At the very least, a reasonable investigation is required under the contractual agreement to make payments in "good faith." This is especially true in the surety and principal context. In the general indemnity agreement here, for example, Associated had the "exclusive right" to decide whether to make payments on the District's claim. The indemnitors were then required to reimburse Associated for all costs and expenses paid out. This almost unlimited discretion on the part of Associated is limited only by the "good faith" requirement. At trial, Associated agreed that a surety has an obligation to make a full, fair, and reasonable investigation of the claims made by an obligee. We agree that when an obligee makes a demand upon a surety in regard to a performance bond, and the surety contracts to make decisions in good faith, the surety must make a reasonable investigation in order to act in good faith. Furthermore, good faith creates an obligation to the indemnitors to minimize costs and make payments only if they are true costs of the claim.

In this case, Associated argues that it did indeed make a reasonable investigation of the claims made by the District and properly paid justified amounts on the claim. Associ-

ated also argues that it had a primary obligation to the District under the performance bond. Associated argues that when the District declared a default, and it made a reasonable determination that the District's claims were valid, it had no other choice or duty but to pay the District's claims. The trial court, however, found that Associated acted as a volunteer and paid the District's claim with no foundation in fact. That is, Associated made payments on the bond when Joint Venture was excused from further obligations on the construction contract. The trial court also found that Joint Venture had fully performed its obligations under the construction contract with the District.

 Associated agrees that if there was a design error in the pipeline plans, Joint Venture would not have been liable for the leaks in the pipeline. Associated argues, nevertheless, that the indemnity agreement provides for reimbursement whether Joint Venture ultimately proves that there was a design error in the plans or not. That is, Associated need only prove potential liability. We agree. Yet, whether there was a design flaw that excused Joint Venture from liability to the District's claims under the performance bond goes directly to Joint Venture's contentions that Associated failed to make a reasonable investigation. The liability of a surety is derivative in nature, and depends on the principal's liability. *Wright Way Constr. v. Harlingen Mall Co.*, 799 S.W.2d 415, 426 (Tex.App.—Corpus Christi 1990, writ denied). Thus, in this case, Associated would only be liable on the performance bond if Joint Venture was actually determined to be in default on the construction contract. *See id.* If there were design errors in the pipeline plans, Joint Venture was not in default because section 3.03 of the construction contract provided that the District was responsible for the adequacy of the pipeline's design.

When Associated received the notice of default from the District, it immediately sent a team including an attorney, Steve Mollenhauer, to Cameron County to investigate the claim. Mr. Mollenhauer is also an engineer. Originally, Associated met with Joint Venture and the District in order to

gather the facts of the construction dispute. Joint Venture contends that from the beginning, however, Associated had a predisposition to settle the claims with the District. Joint Venture's insurance expert stated that Associated acted "precipitously" in regard to its payments to the District and did not act in good faith. Part of the predisposition stemmed from a problem Associated was experiencing with one of its employees. Evidently, the agent who executed the performance bond for Associated had failed to notify the home office of the bond's existence. And, unknown to Joint Venture, Associated had placed Joint Venture on a "watch list" because of the underwriting irregularities. This watch list was normally made up of financially unstable contractors. Associated employees testified, nonetheless, that Joint Venture's watch list status did not affect their handling of the claim.

After its initial discussions with the parties, Associated claims that it then sought to repair the leaks on the pipeline in order to minimize costs and to investigate the cause of the leaks. Liquidated damages were being compounded at $500.00 per day, and the parties agreed that the pipes should be repaired as soon as possible. At this time, Joint Venture offered to repair the lines for additional payment. After discussions with District employees, Associated decided to hire another contractor, Mercer. Associated entered into a time and materials contract with Mercer, and eventually paid Mercer $242,123.00 for repair of the 14 leaks. The repairs were to be made with a full reservation of rights for all parties. Yet, what that reservation included is not clear from the evidence. Joint Venture contends that it merely meant that Associated would initially pay for the repairs and if design errors were discovered, the District would pay. If not, Joint Venture would pay. Thus, Associated minimized its liability, but ensured that some party liable to Associated would pay. Mr. Mollenhauer testified that even before the repairs began, he lacked information on whether the default was proper or whether workmanship caused the leaks on the pipeline. Associated argues that it was merely

seeking to mitigate damages, and that all parties would have been able to recover no matter what the outcome of the repair investigation.

Joint Venture presented evidence that Associated's procurement and payment of the repair agreement with Mercer was not made in good faith. Joint Venture showed that a time and materials contract is the least efficient and most expensive means to hire a contractor. In addition to possible inflated work times and expenses, the more a contractor charges on this contract, the more he receives in payment. That occurs because on top of the figures the contractor charges for the time and materials, he adds fifteen percent as overhead and profit. Further, Associated solicited no other bids for repair of the lines, and did little or no research on Mercer's history and background. Both of these practices violated Associated's own internal policies. Joint Venture also showed that Mercer had been the contractor on another section of the water pipeline, and that several leaks had been discovered on the line that he had built. Joint Venture's owners, Mario Diponio and Guilio Catallo, testified that they could have made the repairs on the leaks for $800.00 a leak or for a fixed price of $10,000.00 to $20,000.00 using weak-o-seal, a method standard in the industry.[2] Mercer on the other hand charged $17,000.00 to $22,000.00 per leak using concrete collars. Associated insists that it chose Mercer and the concrete collars because Mercer had proven effective when fixing its own pipeline leaks. Yet, the District's attorney testified that the District contracted with Mercer independently to fix leaks elsewhere on the line for only $7,500.00 a leak. The District paid at least $10,000.00 less per leak than what Associated was willing to pay Mercer.

During the repair of the pipeline, Associated made several observations and hired a plumbing expert, Lee Wolz, to investigate the leaks. Associated argues that Joint Venture never proved to them that a design error in the plans caused the leaks; thus, they were bound to pay the District's claim.

---

2. Joint Venture's work crews, in an ichneumon-like manner, would tunnel into the completed pipeline and seal leaks in the concrete joints with a plastic-type material.

Associated claims that they repeatedly asked Joint Venture for certain documents and requested they hire an engineer to substantiate their claims. However, Joint Venture presented evidence that they sent at least some of the documents to Associated, but that they were sent back to them because Joint Venture had marked them as joint defense documents. Associated refused to assent to a joint defense against the District so they returned the documents unopened. Joint Venture further presented evidence that the documents Associated was seeking, the "as builts," were readily available from the District's engineer. Furthermore, after Associated fixed the leaks, Joint Venture hired an engineer, Mr. Stiver, who supported their claim of design defects. Joint Venture offered the evidence to Associated, but Mollenhauer testified that Mr. Stiver's presentation was unconvincing because he had never visited the construction site.

Additionally, during the repair phase of the investigation, Mr. Wolz recommended that Associated hire an engineer to determine the cause of the leaks on the pipe. Mr. Wolz had noted in his field notes that at least some of the leaks appeared to have been caused by settlement; settling pipe would support a theory of design error. Mr. Mollenhauer refused the request for an engineer, and made a determination on his own despite the fact that Mr. Wolz told him that the plans may very well have been "impossible."

Associated argues that it believed the pipes used in this soil were appropriate. The concrete manufacturer's video proved the pipe's pressurized strength and stability to Associated. Mr. Wolz, however, told Mr. Mollenhauer that the video was not sufficient proof that the pipe was proper. Mr. Wolz was concerned that the video did not account for conditions experienced in the field, but only presented near perfect conditions. Associated also presented evidence that Mercer's owner, an engineer, believed that Joint Venture alone was responsible for the leaks because of poor workmanship. Mr. Mollenhauer stated that he inspected the pipes and also formed an opinion that the leaks were caused by Joint Venture's poor work techniques. In fact, several witnesses testified

that Joint Venture's work crews incorrectly placed the pipe joints together and improperly back filled the trenches. These practices by themselves could have caused leaks in the pipe.

Although Associated never hired an engineer, Mr. Wolz consulted with two independent engineers about the designs for the pipe. Mr. Wolz, Associated's consultant, testified that both engineers, Bill Ciggalakis and Pat Koots, believed that there was a significant design defect. Mr. Ciggalakis believed that the gravel bedding was improper and Mr. Koots believed that the pipe selection was improper when taking the ground conditions into account. Joint Venture also informed Associated that from the beginning of the project, the District's engineer had not wanted to use concrete pipe; he preferred using a polyethylene or pvc-type line.

Joint Venture argues that these events show that Associated failed to make a reasonable investigation of its claim of a design defect. Associated claims that it made a reasonable investigation and made a good faith decision to pay the District's claims. The testimony elicited at trial was conflicting as to whether there was actually a design defect, yet Joint Venture presented evidence that Associated had ample facts to give rise to the possibility of a design flaw. Notwithstanding recommendations from their own consultant and the opinions of three engineers, Associated chose not to pursue the possibility of Joint Venture's defense by hiring an independent engineer consultant or by taking the issue to the District. In fact, when Associated negotiated the final settlement with the District, they made no effort to excuse even part of the payment because there was a design defect. Associated conceded to the District that Joint Venture's workmanship was to blame, and that the District should be held partly responsible only because the District failed to properly inspect Joint Venture's work. Associated made no investigation beyond its repair work.

From the record, it is unclear whether Associated actually argued that the surety settlement payoff should in any amount be offset by the money the District had retained

for the contract. The record is also unclear if the District reduced Associated's payment because of the outstanding contract balance. It is certain, however, that Associated released its rights to any "retainage" money from the District. Joint Venture argues that it was still owed over $400,000.00 on the construction contract for extra work and work preformed. Joint Venture argues that the surety either walked away from the right to this money or lost Joint Venture's right to it. In fact, the District was holding a substantial "retainage" from the construction contract. Associated's action under these facts is made even more troubling by the terms of the general indemnity agreement. Under sections 5, 7 and 19, if there is a default, the indemnitor assigns to the surety all sums owing and all rights under the contract. By assuming the principal's rights, Associated arguably relinquished Joint Venture's rights to the construction contract balance from the District.

In regard to the alleged arbitration agreement, Joint Venture argues that Associated failed to make a reasonable investigation into Joint Venture's rights. From the genesis of the design defect dispute, Joint Venture wanted to enter into an arbitration settlement. When they made a formal demand, the District refused. Immediately after that refusal, Associated sought to settle the District's claims. Joint Venture argues that good faith requires that Associated at least investigate whether arbitration was still an option to settle the dispute. The surety's assistant vice president agreed that Associated should have investigated the claim that arbitration was no longer available. In this case, however, Associated made no such investigation before it paid the District's claims.

▮▮ The evidence also showed that Associated failed to notify any of the indemnitors in this case that they planned to settle the claim with the District. Associated argues that it was not required to give such notice under the contract. We agree that the contract did not specifically require such notice, but we also recognize that good faith was required in the contract. In this case, Associated chose not to present any defense to

the District about a design defect nor to negotiate a smaller settlement amount on that defense. In effect, Joint Venture was also not allowed to argue their case with the District or to the surety because they had no notice such settlement negotiations were taking place. Under these circumstances and in fulfillment of its contractual duty to act reasonably and in good faith, Associated should have notified Joint Venture. *See Safeco,* 829 S.W.2d at 280; *Delta Eng'g,* 668 S.W.2d at 772; *see also Palevac v. Mid Century,* 101 Nev. 835, 710 P.2d 1389, 1391 (1985) (citing *Fidelity & Casualty Co. of New York v. McNamara,* 127 W.Va. 731, 36 S.E.2d 402 (1945)) (where bond and general indemnity agreement are executed together, surety has an obligation to notify indemnitor before paying a third party under the bond).

Finally, Joint Venture points to Associated's demand for indemnification as evidence that Associated did not act in good faith. When Associated made the demand on the indemnitors, both Mario Diponio and Guilio Catallo asked for an accounting of the payments. The indemnity agreement expressly provided that an itemized, sworn statement of the payments by the surety was necessary to make a prima facie showing of the duty to indemnify. Associated never produced an itemized or sworn accounting of its expenditures to Joint Venture until Associated filed suit. This posture is especially troubling given the fact that Associated never gave notice to Joint Venture that the claim would be settled. When Associated did make an accounting at trial, the expenses sought to be recovered were riddled with expenditures unrelated to Joint Venture and the Cameron County project. Expenses ranging from ABA bar dues to trips to other states were listed as costs Joint Venture should reimburse.

We hold that Associated was contractually required to make claim payments under the bond in good faith. Under the facts of this case, the trial court had sufficient evidence to find that Associated did not reasonably investigate Joint Venture's defense of a design defect or their arbitration rights, that Associated paid excessive amounts for completing the contract, that Associated made unjusti-

fied claims for reimbursement, and that Associated failed to act in good faith. The trial court had sufficient evidence to find that Associated breached the general indemnity agreement. Points two through twelve are overruled.

## DUTY OF GOOD FAITH AND FAIR DEALING

■ By points of error fifteen and sixteen, Associated argues that the trial court erred by finding that there is an extra-contractual duty of good faith and fair dealing between a surety and a principal. Associated also argues that in this case there is no evidence or factually insufficient evidence to support the finding that Associated breached such a duty.

■ The duty of good faith and fair dealing does not exist in the context of all contractual relationships. *English v. Fischer,* 660 S.W.2d 521, 522 (Tex.1983). Such a duty is owed only where there exists a special relationship such as between a liability insurer to its insured. *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987).

In finding a special relationship, the *Arnold* court looked to the unequal bargaining power between the insurer and the insured, the nature of the contracts, and the insurance company's exclusive control over the claim evaluation process. *Arnold,* 725 S.W.2d at 167. The supreme court has recently held that none of these factors weighed in favor of recognizing the duty of good faith and fair dealing between a surety and the obligee. *Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1,* 908 S.W.2d 415, 419 (Tex.1995). *Great American,* however, did not address the duty owed by a surety to its principal under the indemnity agreement.

Associated argues that it has already been determined that no duty of good faith and fair dealing exists between a surety and its principal in Texas. *Fireman's Fund Ins. Co. v. Murchison,* 937 F.2d 204, 209 (5th Cir. 1991). While the *Murchison* court found no duty in that case, the court based its decision on the belief that no disparity in bargaining power existed; therefore, the public policy concerns of *Arnold* were not present. *Id.* We believe that the *Murchison* holding ignores the fundamental nature of the relationship involved in this case. Further, *Murchison* dealt exclusively with the issue of whether the indemnitee was required to notify the indemnitors when issuing bonds. *Id.* at 208. That issue is not before us; rather, other serious issues of reasonableness and notice of claim settlement are. *See Tacon Mechanical Contractors, Inc. v. Aetna Casualty & Sur. Co.,* 860 F.Supp. 385, 388 (S.D.Tex.1994) (under Texas law, principal may bring breach of duty of good faith and fair dealing claim against surety). Thus, we must determine whether there exists a "special relationship" between the surety and principal in this case as to create a duty of good faith and fair dealing. After examining the factors enunciated in *Arnold* and *Great American,* we find that such a relationship does exist.

Like *Arnold,* substantially unequal bargaining power exists between a surety and a principal. *But see Murchison,* 937 F.2d at 209 (because indemnitors were "sophisticated businessmen," and had owned the Dallas Cowboy franchise, there was no disparity in bargaining power). In order for a contractor to bid and accept work on a public works project in excess of $25,000, the contractor must first obtain a performance and payment bond. TEX.GOV'T CODE ANN. § 2253.021(a) (Vernon Pamph.1995); TEX.LOC.GOV'T CODE ANN. § 252.044 (Vernon 1988). In the case of projects with a state entity, the bond must be executed by a corporate surety. TEX. GOV'T CODE ANN. § 2253.021(d) (Vernon Pamph.1995). The contractor's situation is quite simple; he must be bonded or he will be unable to work on these jobs. Although many contractors exercise capable judgment and handle varied business interests, the terms and conditions of the bonds and indemnity agreements that they must execute are entirely left to the will of the surety and the obligee owner. *See* TEX.GOV'T CODE ANN. § 2253.021(e) (Vernon Pamph.1995) (form of public work contracts must be approved by attorney general or "awarding governmental entity"). The general indemnity agreement here was entirely formed by the surety.

As evidenced in this case, Joint Venture was required not only to execute the bond dictated by the owner and the surety, but Associated also required a separate indemnification agreement. Not only did Associated require Mario Diponio and Guilio Catallo, the primary owners and supervisors of the contracting businesses, to sign the indemnity agreement, but Associated also required Phyllis Diponio and Rosemary Catallo, the men's wives, to sign the agreement individually as well. In addition, the general indemnity agreement in this case provides that, upon default, the indemnitor assigns to the surety all sums owing and all rights under the contract.

There is also a serious concern that a surety may take advantage of a bond principal in the claims resolution process. When a principal is declared in default, the surety steps in to take over all negotiations and claims of the obligee. Under a typical general indemnity agreement, as is the case here, the surety retains the exclusive right to decide and determine whether any claim shall be paid. In fact, the surety normally requires that it have the unfettered right to determine whether any claim will be paid, compromised, resisted, defended, tried or appealed. This enormous power over the indemnitors certainly gives the surety exclusive control over the claims evaluation process. Upon default or upon any dispute with the obligee, a surety may be inclined to settle or complete a claim too quickly and protect its own interests.[3] *See* TEX.BUS. & COM.CODE ANN. § 34.04 (Vernon 1987) (subrogation rights of surety). The surety has almost unlimited power of reimbursement from the indemnitors for any funds it spends on an obligee's claim. If the contractor is solvent, the surety runs almost no risk at all.

Although the indemnitor may have recourse against the obligee on the underlying contract for damages and breach, if the surety makes a payment to the obligee, it must indemnify. Thus, a principal has only a limited defense against the surety and obligee. As outlined in *Great American,* the obligee has a right against both the principal and the surety. *Great Am.,* 908 S.W.2d at 418. And, the surety has "exclusive rights" against the principal. These relationships leave the principal in a weakened position as against both the surety and the obligee.

Moreover, in the context of liability insurance and indemnity, the concept of a duty of good faith and fair dealing was originally recognized. *G.A. Stowers Furniture Co. v. American Indem. Co.,* 15 S.W.2d 544, 548 (Tex.Comm'n App.1929, holding approved). *Stowers* held that in regard to its principal, "the indemnity company is held to that degree of care and diligence which a man of ordinary care and prudence would exercise in the management of his own business." *Stowers,* 15 S.W.2d at 548; *see also Fireman's Fund Ins.,* 490 S.W.2d at 824 (surety must show that settlement of claim was reasonable, prudent, and in good faith under the circumstances). We, therefore, find that Associated owed a duty of good faith and fair dealing to Joint Venture when making payments pursuant to a bond claim and when settling the District's claims.

 Associated argues that requiring a duty of good faith and fair dealing between the surety and the principal will upset the tripartite relationship. We do not agree. Simply requiring the surety to act in good faith in its payments on the bond will not force it to act in bad faith towards the obligee. A surety will be able to fulfill its proper obligations under the bond and ensure that payments are made only in good faith. Re-

---

**3.** In its amicus curiae brief to the supreme court in *Great American,* which has also been filed in this case, Associated argues that,

> [t]he surety has no particular interest in endorsing a principal's refusal to perform or repair. As far as the surety is concerned, if the principal is capable of meeting reasonable demands of the obligee, it ought to do so. The surety can freely refuse to side with the principal, because the principal has no right to recover from the surety. The surety is not bear-

ing any risks for the principal. The penal amount protects the surety but not the principal. The principal intent on resistance to an obligee's demand will have to bear the consequences, including the expense of all litigation, and the surety will be reluctant to join in that fight unless the principal posts collateral.

This stance only buttresses Joint Venture's claim that a surety may act "precipitously" and will settle or spend money on a bond claim without regard to its reasonableness.

quiring the surety to make a reasonable investigation of claims and to give a principal's interests at least as great consideration as its own is not overly burdensome, nor does it create increased uncertainty in the surety's duties. *See Dodge v. Fidelity and Deposit Co. of Md.,* 161 Ariz. 344, 778 P.2d 1240, 1242–43 (1989).

Associated next argues that the evidence at trial was insufficient to support the finding that Associated breached the duty of good faith and fair dealing. Good faith and fair dealing between surety and principal means reasonable investigation and equal treatment of interests. "Where one acts as agent under such circumstances, he is bound to give the rights of his principal at least as great consideration as he does his own." *Stowers,* 15 S.W.2d at 548; *see Windowmaster,* 722 F.Supp. at 1535 (citing *Ballard v. Citizens Casualty Co. of New York,* 196 F.2d 96 (7th Cir.1952); *American Fidelity & Casualty Co. v. G.A. Nichols Co.,* 173 F.2d 830, 832 (10th Cir.1949); *Cernocky v. Indemnity Ins. Co. of N. Am.,* 69 Ill.App.2d 196, 216 N.E.2d 198, 204 (1966)). Additionally,

> parties to an indemnity agreement which subjects the right to compromise a claim against the principal to the sole discretion of the surety must reasonably expect that compromise and payment will be made only after reasonable investigation of the claims, counterclaims and defenses asserted in the underlying action.

*City of Portland,* 750 P.2d at 175; *see Viles v. Security Nat'l Ins. Co.,* 788 S.W.2d 566, 567 (Tex.1990) ("special relationship" imposes duty to investigate claims thoroughly); *State Farm County Mut. Ins. v. Moran,* 809 S.W.2d 613, 618 (Tex.App.—Corpus Christi 1991, writ denied).

As we have already discussed under our breach of contract analysis, we believe there was sufficient evidence for the trial court to find that Associated failed to make a reasonable investigation. We also find that there was sufficient evidence to conclude that Associated did not give Joint Venture's rights at least as great consideration as its own.

Points fifteen and sixteen are overruled.

## FIDUCIARY DUTY

■ By points of error thirteen and fourteen, Associated argues that the trial court erred in finding that a fiduciary relationship existed between Associated and Joint Venture. Associated also argues that no evidence or factually insufficient evidence exists to support the judgment that they breached such a relationship.

■ A fiduciary relationship exists when the parties are under a duty to act for or give advice for the benefit of another upon matters within the scope of the relationship. *Stephanz v. Laird,* 846 S.W.2d 895, 901 (Tex. App.—Houston [1st Dist.] 1993, writ denied). It exists where a special confidence is placed in another who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one placing confidence. *Id.*

■ A fiduciary relationship is extraordinary and will not be lightly created; the mere fact that one subjectively trusts another does not, alone, indicate that he placed confidence in another in the sense demanded by a fiduciary relationship. *Id.* at 901–02. Something apart from the transaction between the parties is required. *Id.* A fiduciary relationship arises either as a result of dominance on the part of one, or weakness, dependence on the part of the other. *Texas Bank and Trust Co. v. Moore,* 595 S.W.2d 502, 508 (Tex.1980). The relationship need not be formal; however, absent the demonstration of a formal fiduciary relationship, the evidence must show that the dealings between the parties continued for such a time that one party is justified in relying on the other to act in his best interest. *Stephanz,* at 902. A fiduciary relationship may be informal whether the relation is moral, social, domestic, or merely personal. *Crim Truck & Tractor v. Navistar Int'l,* 823 S.W.2d 591, 594 (Tex.1992). Although the existence of a confidential relationship is usually a question of fact, when the issue is one of no evidence, it becomes a question of law. *Id.*

In its findings of fact and conclusions of law, the trial court found that Associated induced Joint Venture into a confidential or

fiducial relationship by its acts and practices. The trial court also concluded that Associated induced Joint Venture by promising to manage its affairs.

Joint Venture argues that a fiduciary relationship exists because Associated retains the exclusive right of control over claim settlement and because Associated can make ultimate determinations over Joint Venture's liability under the performance bond. Joint Venture also argues that Associated represented that it would protect Joint Venture's interests. While we agree that the indemnity agreement gives Associated the right of control over claims made on the bond, we do not believe that a surety owes the additional duty of a fiduciary.

The relationship between a surety and principal cannot be examined without considering the surety's obligation to the obligee. In this case, Associated had certain obligations to the District under the performance bond, but also had duties to its principal. We believe that the duty of good faith and fair dealing adequately and substantially protects the principal's assailable position.

■ Although a fiduciary duty encompasses at the very minimum a duty of good faith and fair dealing, the converse is not true. *Id.* The duty of good faith and fair dealing merely requires the parties to "deal fairly" with one another and does not encompass the more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty. *Id.* Recognizing a fiduciary duty under the general indemnity agreement could abrogate the terms of the contract altogether. The notion that a surety may settle or compromise a claim even when the principal is ultimately held not liable under the contract would come into question. Thus, we find that although a surety must "deal fairly" with his principal, it need not and should not be legally obliged to place the principal's interests above its own.

Moreover, we find no evidence in this case to suggest that Joint Venture had established an informal fiduciary relationship with Associated. The two entered into a strict business relationship that was beneficial for both. There was also no evidence that the two

parties had a long term relationship. Joint Venture asserts, nonetheless, that when Associated began its investigation, the surety's representatives promised to work as a team. Mr. Catallo testified that he felt that the two were a "team." Mr. DiPonio testified that Mr. Mollenhauer stated that the two were "partners, we were all one family" and that Joint Venture shared confidences with Associated. Mr. Mollenhauer and other Associated agents denied making these representations. Yet, even if Joint Venture's claims are true, a fiduciary relationship was not established. Associated told Joint Venture that it was conducting an investigation and had responsibilities to the obligee. Associated explicitly informed Joint Venture that they would not enter into a joint defense, and when Joint Venture sent privileged "joint defense" documents to Associated's representatives, Associated sent the documents back unopened. Even if Associated was acting as a "partner or teammember," Joint Venture's subjective belief alone does not create a fiduciary duty. Because we find no fiduciary relationship exists, we sustain points thirteen and fourteen.

## STATUTORY VIOLATIONS

■ By points twenty-two through twenty-nine, Associated argues that the trial court erred by finding that it was liable for unfair or deceptive acts under article 21.21 of the Insurance Code. Suretyship does not constitute the "business of insurance" under article 21.21. TEX.INS.CODE ANN. art. 21.21, § 2(a) (Vernon Supp.1995); *Great Am.,* 908 S.W.2d at 424. Thus, Associated is not liable to Joint Venture under article 21.21 of the Insurance Code. Alternatively, Joint Venture argues that the trial court's findings concerning article 21.21 should be affirmed because they also support Deceptive Trade Practices–Consumer Protection Act ("D.T.P.A.") violations.

When findings of fact are filed by the trial court, they shall form the basis of the judgment upon all grounds of recovery and of defenses embraced therein. TEX.R.CIV.P. 299. However, when one or more elements of recovery have been found by the trial

court, omitted unrequested elements, when supported by the evidence, will be supplied by presumption in support of the judgment. *Id.* Furthermore, refusal of the trial court to make a finding requested shall be reviewable on appeal. *Id.*

■ In this case, the trial court made no finding as to recovery under the D.T.P.A. In a letter to the parties, the trial court explained that the D.T.P.A. did not apply to this case. The trial court did find that Associated had "engaged in unfair and deceptive acts or practices" and had "omitted information or made false implication or impression that was either misleading or deceptive." The trial court found that these acts resulted in damages to Joint Venture. These elements support recovery under the D.T.P.A. TEX.BUS. & COM.CODE ANN. §§ 17.46(a), (b) & (b)(23) (Vernon 1987 & Supp.1995). Although Joint Venture pleaded D.T.P.A. violations, we can find no evidence to indicate that Joint Venture requested a D.T.P.A. finding and was refused; thus, we must determine if Joint Venture is entitled to recovery under the D.T.P.A. because we can presume elements in support of the judgment as supported by the evidence. Conversely, if Joint Venture requested the D.T.P.A. findings, but in its letter to the parties, the trial court refused, we may still review the refusal to find on appeal. We will, therefore, review whether Joint Venture is entitled to recovery under the D.T.P.A.

■ Consumers may bring an action under the D.T.P.A. TEX.BUS. & COM.CODE ANN. § 17.46(a) (Vernon 1987). Whether a plaintiff is a consumer under the D.T.P.A. is a question of law to be determined by the trial court from the evidence. *Commercial Escrow v. Rockport Rebel*, 778 S.W.2d 532, 536 (Tex.App.—Corpus Christi 1989, writ denied). A "consumer" is an individual or corporation "who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more." TEX.BUS. & COM.CODE ANN. § 17.45(4) (Vernon 1987). A plaintiff establishes its standing as a consumer in terms of its relationship to a transaction, not by a contractual relationship with the defendant. *Commercial Escrow,*

778 S.W.2d at 536. The only requirement is that goods or services sought or acquired by the plaintiff form the basis of its complaint. *Id.*

In this case, the trial court found that Joint Venture acquired services by purchase from Associated. Insuring another's performance is a "service" as defined by the D.T.P.A. TEX.BUS. & COM.CODE ANN. § 17.45(2) (Vernon 1987); *HOW Ins. v. Patriot Fin. Serv.,* 786 S.W.2d 533, 539 (Tex. App.—Austin 1990, writ denied); *see also Transport Ins. Co. v. Faircloth,* 861 S.W.2d 926, 940 (Tex.App.—Beaumont 1993, no writ) (Section 17.46 of D.T.P.A. encompasses any type of business activity). Joint Venture purchased the bond service from Associated and has assets less than $25 million. We find that Joint Venture is a "consumer" and has the right to bring a D.T.P.A. claim against Associated.

■ Joint Venture argues that three deceptive acts caused them damages. Joint Venture claims that Mr. Mollenhauer made false, misleading statements and omitted information. First, Joint Venture argues that Mr. Mollenhauer represented that he would make a full and fair investigation. We find no evidence in the record to support that claim. Second, Joint Venture claims that Mr. Mollenhauer stated that Associated would act as teammember or partner with Joint Venture. As we have examined, however, Mr. Catallo testified that those words were not used. Mr. Diponio testified that he "felt" like the two were a team and that there was a "feeling" of partnership. We find no evidence that these statements were actually made.

■ Third, Joint Venture argues that Mr. Mollenhauer informed Joint Venture that Associated would not come between Joint Venture and the District, that Associated would keep them fully informed and that Associated would inform them before Associated settled the District's claim. Mr. Catallo and Mr. Diponio testified that these representations were made at the initial September 11, 1990 meeting. At trial, Mr. Mollenhauer testified that he investigated the construction dispute, that Associated entered

into settlement negotiations with the District, but he never informed Joint Venture that Associated was going to or did settle the District's claims. Joint Venture's owners also testified that they were never informed that settlement negotiations were taking place. Joint Venture also presented evidence that Associated's internal procedure recommended keeping the principal informed and required the agent to inform the principal before settling. Joint Venture contends that the bond underwriting problems led to the deceptions. We find that there is sufficient evidence to support a finding that Associated engaged in false, misleading or deceptive acts in its bonding service. *See Transport Ins. Co.*, 861 S.W.2d at 940 (when unlisted act or practice is alleged, plaintiff must obtain finding that act or practice occurred and that it was deceptive).

We must now ascertain if these misleading acts caused damage to Joint Venture. Joint Venture asserts that the misleading, deceptive statements caused them to delay in seeking their arbitration rights with the District; therefore, they lost their right to payment from the District under the construction contract.

■ A consumer may maintain an action under the D.T.P.A. when the violation is a "producing cause" of actual damages. TEX. BUS. & COM.CODE ANN. § 17.50(a) (Vernon 1987). Misrepresentation under the D.T.P.A. is a "producing cause" of damages if it, in a natural sequence, excited, contributed to, or factually caused the harm complained of. *Padgett v. Bert Ogden Motor's, Inc.*, 869 S.W.2d 532, 536 (Tex.App.—Corpus Christi 1993, writ denied); *Jeep Eagle Sales v. Mack Massey Motors*, 814 S.W.2d 167, 175–76 (Tex.App.—El Paso 1991, writ denied). In this case, Joint Venture argues that it lost $425,579.67 because of Associated's deceptive acts. This money was the amount the District had "retained" in the underlying construction contract. Joint Venture claims that the District owed them this amount because of work performed and for extra work costs. The District disagreed, declared that Joint Venture had breached the construction contract, and thereby kept the money "owing" on the contract.

Under the facts and circumstances of this case, Joint Venture produced no evidence to show that Associated's deceptive representations were a producing cause of Joint Venture's damages; that is, the right to the "retainage" money. Because Associated failed to keep them informed and because Associated failed to notify them that the claim was to be settled, Joint Venture merely claims that they delayed in seeking their arbitration rights under the construction contract.

Associated's involvement in the dispute is no evidence that Associated caused Joint Venture to lose its arbitration rights. Associated was obligated to investigate and become involved in the dispute. Joint Venture contends, however, that when the surety became involved in the dispute, the District backed out of its agreement to arbitrate. While this may be true, Associated had no other choice but to become involved; it had obligations to the District under the performance bond. Moreover, the District maintains that it refused arbitration simply because the demand was untimely. The District's attorney testified that at no time did Associated seek to stop arbitration nor did it ever instruct the District to renege on its agreement with Joint Venture. Associated's attorneys testified that at no time during the claim investigation did they seek to stop arbitration nor did they ever instruct any party not to arbitrate.

Associated's involvement in the performance dispute was not only legally justified, it was required. If the District sought to back out of arbitration because Associated became involved, Joint Venture could have forced arbitration under the terms of the construction contract. Under its contract with the District, Joint Venture had the independent right to seek arbitration. Whether it received information from Associated made no difference. The right to arbitration rested solely with Joint Venture under its agreement with the District.

Additionally, the construction contract provided that within ten days after a final decision by the engineer, Joint Venture could demand arbitration of the dispute. The District claimed in this case that Joint Venture

untimely demanded arbitration. Joint Venture demanded arbitration on September 25, 1990, more than ten days after the engineer's decision. The District asserted that the engineer's final decision was made on August 13, 1990. Associated settled the District's claim in July 1991. Thus, even if Associated had notified Joint Venture that it was settling the case, Joint Venture would have still been untimely in its demand and not entitled to arbitration. In fact, Joint Venture would have been almost a year too late in its demand.

Notwithstanding the timeliness of Joint Venture's demand or Associated's representations, Joint Venture made no showing that arbitration would have concluded in its favor. Joint Venture asks us to award damages that it may not have been entitled to under the contract. We refuse to speculate on what arbitration would have concluded. We find no evidence that Associated's misrepresentations excited, contributed to, or factually caused the harm complained of by Joint Venture. Joint Venture could have made a timely demand for arbitration or judicially enforced that right.

Points twenty-two through twenty-nine are sustained. Because we find that Associated is not liable under article 21.21 of the Insurance Code or the D.T.P.A., we also overrule Joint Venture's single crosspoint seeking mandatory trebling under those provisions.

### DAMAGES

#### Construction Contract Balance

By points of error thirty and thirty-one, Associated argues that there is no evidence or factually insufficient evidence to support the finding that it is liable for Joint Venture's construction contract damages. Associated argues that the trial court erred by finding that it was liable for the $425,-579.67 due under the construction contract. We have found that Associated breached the indemnity agreement and breached its duty of good faith and fair dealing. We, therefore, find that Joint Venture may recover the construction contract's outstanding balance from Associated.

The District retained construction contract money because of Joint Venture's alleged breach. Joint Venture alleged and proved, nonetheless, that it was entitled to the "retainage" because it substantially completed the contract and completed extra work for the District even though there was a serious design error. Joint Venture also provided testimonial evidence that it was excused from certain delays in construction. The delays were caused by the bidding irregularities, the weather, and unidentified problems in the plans. Joint Venture presented evidence that they were promised extra payment and 300 delay days on the contract from the District. Although normally Joint Venture would recover on these claims directly from the District, Associated stepped into the dispute and acted in Joint Venture's place. *Cf. North Harris County Junior College v. Fleetwood Constr. Co.*, 604 S.W.2d 247, 252–253 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.) (contractor must prove that owner is responsible for delay or hindrance).

Because we have found that Associated breached its contract with Joint Venture, we must fully examine what damages it suffered. Under the terms of the bond and more importantly under the general indemnity agreement, Associated obtained Joint Venture's defenses and rights under the construction contract. Associated argues that when it settled the bond claim with the District, it bargained away at least $118,585.00 "retainage" owed to Joint Venture under the construction contract. Associated used this figure to help offset its settlement payment to the District. Further, we recognize that under the indemnity agreement when Joint Venture was declared in default, Joint Venture gave Associated all rights to the money owing under the construction contract. Actually, Joint Venture was required to assign its rights to Associated; thus, Associated obtained full rights to Joint Venture's claims under the contract. Under sections 5, 7 and 19 of the indemnity agreement, if there is a default, the indemnitor assigns to the surety all sums owing and all rights under the contract. Associated has, arguably, relinquished Joint Venture's rights to the construction contract balance from the District. At the

least in this case, Associated unreasonably failed to pursue them or failed to collect the outstanding funds for Joint Venture. Because we have found that Associated breached its contract with Joint Venture by failing to properly investigate its claim and by settling the District's claim without considering Joint Venture's interests, we find that Associated is liable for Joint Venture's construction contract damages with the District.

Joint Venture presented evidence that it was entitled to $118,585.00 as the outstanding balance of the construction contract for work performed, and $372,248.90 for extra work ($150,880.90 for internal repairs to the pipeline, $146,000.00 for work on the unidentified resaca, and $75,368.00 for extra well pointing required by the District). There was sufficient evidence to support the award of $425,579.67 in damages under the construction contract. Points thirty and thirty-one are overruled.

## Lost Profits

By points thirty-two and thirty-three, Associated argues that the trial court erred in awarding lost profits to Joint Venture, specifically to CAT Contracting and Michigan Sewer. Associated argues that as a matter of law the lost profits were too speculative and that there is legally and factually insufficient evidence to support the award.

■ Recovery of lost profits does not require that the loss be susceptible to exact calculation. *Texas Instruments v. Teletron Energy Mgt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994); *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994) (per curiam). However, the injured party must do more than show that they suffered some lost profits. *Szczepanik*, 883 S.W.2d at 649. The amount of the loss must be shown by competent evidence with reasonable certainty. *Id.* What constitutes reasonably certain evidence of lost profits is a fact intensive determination. *Id.* At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *Id.* Recovery of lost profits must be predicated on one complete calculation. *Id.*

■ The trial court awarded $1,676,271.00 in lost profits to CAT Contracting and $2,489,034.00 to Michigan Sewer. Associated argues that as a matter of law, the award of lost profits is too speculative. Associated also argues that the evidence is legally and factually insufficient to support these awards.

The facts of this case show that both CAT and Michigan Sewer were established enterprises and capable of getting bonding before this construction contract and the dispute that followed. "Where the business is shown to have been already established and making a profit at the time of the breach or the tort committed, such existing profit together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost." *Teletron*, 877 S.W.2d at 279 (quoting *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938)). Joint Venture presented evidence that after Associated's breach of contract, payment to the District on the bond, and the filing of this lawsuit, that neither CAT nor Michigan Sewer could get bonding. Joint Venture also presented evidence that a company's character and reputation are extremely important when seeking bonds. It showed that because of Associated's action, it was unable to get the bonding previously available to it. We do not believe that Joint Venture's lost profits are too speculative as a matter of law.

■ Associated argues, however, that neither company was profitable and that their lost profit figures fail to take into account company history. Joint Venture's financial expert, Mr. Cortez, testified that he calculated lost profits based on industry standards and possibilities of future profit within the construction industry. Although Mr. Cortez looked into each company's financial statements for history, he testified that he disregarded income tax returns and past profit margins. His profit margin and gross income figures were based on the industry as a whole. Such a formulation is not reasonably certain for CAT's or Michigan Sewer's lost profits. *See Szczepanik*, 883 S.W.2d at 650. Yet, the requirement of "reasonable certainty" in the proof of lost profits is intended to be flexible enough to accommodate

the myriad circumstances in which claims for lost profits arise. *Teletron*, 877 S.W.2d at 279.

Associated's financial expert, Mr. Bright, testified that the companies' past performance and history should have been included in any lost profits calculation. We agree. To recover lost profits, a party must show either a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty. *Allied Bank W. Loop v. C.B.D. & Assocs.*, 728 S.W.2d 49, 54–55 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). In this case, mere speculation about the industry's future, the companies' future bonding capacity, or future work is not a reasonably certain calculation.

Associated's expert, however, testified as to this historical data along with industry perspective. Mr. Bright testified that CAT's profit margin averaged 4 percent, and Michigan Sewer had a 12.7 percent profit margin. Mr. Bright also concluded that CAT's total incremental revenue would be $2,834,718.00 and Michigan Sewer's would be $2,308,008.00. Given these figures and average past income, Mr. Bright calculated that CAT could have expected $113,389.00 in lost profits and Michigan Sewer $293,117.00 due to Associated's breach. With actual profit margins and profit estimations taken into account, the trial court was presented with reasonably certain and sufficient evidence to award lost profits in the amount presented by Associated's expert, Mr. Bright. Thus, we sustain points thirty-two and thirty-three and reform the award of lost profit damages to $113,389.00 for CAT Contracting and $293,117.00 for Michigan Sewer.

## Mental Anguish

By point of error thirty-four, Associated argues that the trial court erred by awarding mental anguish damages to Mario and Phyllis DiPonio and Guilio and Rosemary Catallo. Associated argues that Joint Venture neither pleaded nor proved any cause of action which supports an award for mental anguish.

Exemplary damages and mental anguish damages are recoverable for a breach of the duty of good faith and fair dealing under the same principles allowing recovery of those damages in other tort actions. *Arnold*, 725 S.W.2d at 168. Thus, Joint Venture is entitled to mental anguish damages.

Mental anguish consists of emotional response of the plaintiff caused by tortfeasor's conduct. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 368 (Tex. 1987). To establish mental anguish, a plaintiff must show more than mere worry, anxiety, vexation, embarrassment, or anger. *Fidelity & Guar. Ins. Underwriters v. Saenz*, 865 S.W.2d 103, 113 (Tex.App.—Corpus Christi 1993, no writ). Mental anguish implies a relatively high degree of mental pain and distress. *Id.*

Phyllis DiPonio testified that she was devastated because of Associated's actions. She also described the tearful, sleepless nights that she had experienced. She also explained that she had to take several medical leave days from work because of the severe distress she experienced as a result of Associated's response to the claim. Mrs. DiPonio also testified that Associated had made her relationship with Mario more stressful. Mario had begun to use tobacco again and the experience was very hard on him. Mario stated that all he had left was his company, and without it he would be dead. Rosemary Catallo testified that she had many sleepless nights over the problems with Associated. She would wake in a "panic attack, -fear, heart pounding" because she was afraid of Associated.

We conclude that the evidence is sufficient to support the trial court's finding of mental anguish damages for Mario and Phyllis DiPonio and Rosemary Catallo. We can find, however, no record evidence of any mental anguish suffered by Guilio Catallo. The trial court erred by awarding him mental anguish damages.

Once the existence of mental anguish is established, the incalculable amount cannot logically be refuted or shown to be factually insufficient because there are no objective facts by which to measure the amount. *Id.; State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d 590, 601 (Tex.

App.—El Paso 1991, writ denied). Translating mental anguish into dollars is necessarily an arbitrary process. *Saenz*, 865 S.W.2d at 114. Much discretion must be given in setting the amount. *Id.* We are not free to substitute our judgment for that of the trial court's judgment. *Id.* Therefore, point thirty-four is sustained in part and reversed in part. We reverse that part of the trial court's judgment pertaining to Guilio Catallo's mental anguish and affirm the mental anguish damages granted in favor of Mario and Phyllis DiPonio and Rosemary Catallo.

## Indemnification

By point thirty-five, Associated argues that it is entitled to $853,532.41 in indemnification and an additional $388,111.00 in fees and expenses. We have found, however, that Associated breached the general indemnity agreement and the duty of good faith and fair dealing with the Joint Venture as to the payments Associated made on the performance bond. Associated is not entitled to indemnity under the general indemnity agreement nor the additional expenses. Point thirty-five is overruled.

Because our determination of damages under breach of contract, breach of the duty of good faith and fair dealing, and D.T.P.A. is dispositive, we need not address Associated's points concerning the tortious interference or common law fraud findings. TEX.R.APP.P. 90(a).

Accordingly, we REVERSE the trial court judgment and RENDER that the Joint Venture take nothing from Fireman's Fund. We MODIFY the trial court judgment awarding lost profits by reforming the judgment to $113,389.00 for CAT Contracting and $293,-117.00 for Michigan Sewer. We REVERSE that part of the trial court's judgment pertaining to Guilio Catallo's mental anguish damages and RENDER that he not recover on that claim.

In all other respects, we AFFIRM the trial court judgment.

Dissenting Opinion by DORSEY, J.

DORSEY, Justice, dissenting.

I respectfully dissent from that portion of the majority opinion that holds that there is a common law duty of good faith and fair dealing between a surety and a principal. I do not believe that a "special relationship" existed between these experienced, sophisticated business entities that requires a common law duty of good faith and fair dealing owed by Associated to Joint Venture. Even if there was some sort of special relationship, furthermore, I do not believe that the fact situation seen in this case is sufficiently common to announce a new rule of law creating a new duty in surety contracts.

A surety relationship, by its very nature, protects the surety to the potential detriment of the principal. *See* 72 C.J.S. *Principal and Surety* § 224 (1987) ("In general ... [a] surety acquires the right to be exonerated by the principal debtor.") According to the majority, Joint Venture was forced to bargain from an unequal position because state statutes required that they obtain a bond on the construction project and because the bonding company they contracted with, Associated, also required a separate indemnity agreement protecting them in case Joint Venture defaulted and Associated was forced to pay on the bond.

I do not believe that this situation created unequal bargaining positions. The principal in this case was experienced with municipal construction projects and had undoubtedly entered into surety arrangements before. Associated was not the only bonding company that could issue the required construction bonds. Each of these companies was sophisticated, and they entered into the surety arrangement after arms-length bargaining.

As "principal" in this arrangement, Joint Venture was the party on whom the primary obligation rested. *See* 72 C.J.S. *Principal and Surety* § 4 (1987). It was Joint Venture's responsibility to complete the construction in an acceptable manner, and to indemnify Associated if Associated was forced to pay on the construction bonds. Associated, as surety, guaranteed to the District that the District would not lose money on the project due to Joint Venture's actions. And the District, not Associated, held the

statutory authority to approve the form of the bonds. *See* TEX.GOV'T CODE ANN. § 2253.021(e) (Vernon Pamph.1995). Each of these entities had crucial roles in the surety arrangement, and none was in a more powerful bargaining position when entering into the arrangement.

As noted by the Texas Supreme Court in *Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1,* 908 S.W.2d 415, 418 (Tex. 1995), the three-way surety relationship is a different situation from a liability insurance contract, in which the insurer owes a duty of good faith and fair dealing to its insured. As the supreme court stated:

> While a liability insurance contract involves only two parties, the insurer and the insured, suretyship involves a tripartite relationship between a surety, its principal, and the bond obligee, in which the obligation of the surety is intended to supplement an obligation of the principal owed to the bond obligee. (citations omitted).

In determining that no common law duty of good faith and fair dealing existed between a surety and a bond obligee, the supreme court noted that none of the factors which led them to find such a duty in the insurance context (unequal bargaining power, the nature of insurance contracts, and exclusive control over the claim evaluation process) existed in the construction surety context. Rather, the supreme court held that the parties had conducted arms-length negotiations and did not bargain from unequal positions. Furthermore, because sureties in Texas have the express statutory right to force the bond obligee to sue the principal before pursuing actions against the surety, the supreme court declined to impose a common law duty on the surety simply because it is in the position to delay payments on a bond. *Id.* at 419.

In *English v. Fischer,* 660 S.W.2d 521 (Tex.1983), the Texas Supreme Court determined that an implied duty of good faith and fair dealing does not exist in every contract. Since then, the duty of good faith and fair dealing has been established only sparingly in Texas, and the courts have rebuffed efforts to expand it. *E.g., SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347, 356 (Tex. 1995) (no duty owed by drug testing laboratory to person tested as part of a pre-employment drug screening); *Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 279–80 (Tex.1995) (no duty between insurer and third-party claimant); *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 698 (Tex.1994) (no duty between an insurance agent and the insured absent a contract giving rise to a special relationship); *Federal Express Corp. v. Dutschmann,* 846 S.W.2d 282, 284 n. 1 (Tex. 1993) (no implied covenant in context of employment relationship); *Winters v. Houston Chronicle Pub. Co.,* 795 S.W.2d 723, 724 n. 2 (Tex.1990) (same); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 595 (Tex.1992) (no duty between franchisor and franchisee where a statutory scheme controlling the relationship is already in existence); *FDIC v. Coleman* 795 S.W.2d 706, 708–09 (Tex.1990) (no duty between mortgagor and mortgagee, creditor and guarantor, or creditor/FDIC acting as receiver and guarantor); *Exxon Corp. v. Atlantic Richfield Co.,* 678 S.W.2d 944, 947 (Tex.1984) (no implied duty in an oil & gas contract to vary the terms of the contract).[1]

I would sustain Associated's points of error fifteen and sixteen. Because there is no common law duty of good faith and fair dealing owed by Associated to Joint Venture, there can be no breach of that duty and no resulting tort damages. I would therefore sustain Associated's point of error thirty-four in its entirety, and disallow the $700,000

---

1. *See also Wheeler v. Yettie Kersting Mem. Hosp.,* 866 S.W.2d 32, 52 (Tex.App.—Houston [1st Dist.] 1993, no writ) (no duty of good faith and fair dealing in context of a claim against a health-care provider); *Texstar N. Am., Inc. v. Ladd Petroleum Corp.,* 809 S.W.2d 672, 677–78 (Tex. App.—Corpus Christi 1991, writ denied) (no implied duty of good faith and fair dealing in oil & gas joint operating agreement); *Herndon v. First Nat'l Bank of Tulia,* 802 S.W.2d 396, 399 (Tex. App.—Amarillo 1991, writ denied) (no duty of good faith and fair dealing between bank and borrower); *Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477, 481 (Tex.App.—Corpus Christi 1989, writ denied) (no duty of good faith and fair dealing between a supplier and distributor); *Cluck v. Frost Nat. Bank of San Antonio,* 714 S.W.2d 408, 409–10 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.) (no duty of good faith and fair dealing between bank and customer).

awarded for mental suffering to the DiPonios and the Catallos.